## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **DANIEL FRANCISCO URIBE,** | Case No. **26 - 661** |
| *Plaintiff,* | Patent Case |
| v. | JURY TRIAL DEMANDED |
| **AMINOCHAIN, INC., a Delaware corporation,** | |
| *Defendant.* | |

## COMPLAINT FOR PATENT INFRINGEMENT

### 35 U.S.C. §§ 271(a), 271(b), 284 and 285

Plaintiff Daniel Francisco Uribe ("Mr. Uribe"), proceeding *pro se*, brings this action for patent infringement against Defendant AminoChain, Inc. ("AminoChain" or "Defendant"), and alleges as follows:

**Reservation of Rights as to Individual Officer:** Mr. Uribe presently sues only AminoChain, Inc. References herein to Caspar Barnes — AminoChain's Chief Executive Officer and co-founder — describe acts taken on behalf of AminoChain in his official capacity. Mr. Uribe expressly reserves the right to amend this Complaint, pursuant to Federal Rule of Civil Procedure 15, to add Caspar Barnes as a defendant in his individual capacity upon discovery of facts establishing his personal contacts with this District sufficient to support individual personal jurisdiction.

## I. NATURE OF THE ACTION

1. This is an action for direct and induced patent infringement under 35 U.S.C. §§ 271(a) and 271(b). Mr. Uribe is the inventor and owner of U.S. Patent Nos. 11,915,808 B1 (the "'808 Patent," attached as **Exhibit A**) and 11,984,203 B1 (the "'203 Patent," attached as **Exhibit B**), which claim specific technical implementations using non-fungible tokens conforming to the ERC-721 and ERC-1155 standards to represent unique biological specimens, link specimen-specific provenance metadata, enforce informed consent via smart-contract logic, and store ownership and control in private-key-controlled digital wallets on a public blockchain.

2. Mr. Uribe conceived this invention in 2018, filed his first provisional patent application on May 31, 2018 (U.S. Provisional Application No. 62/678,894), published the foundational peer-reviewed paper in the *Journal of the British Blockchain Association* on May 30, 2020, and engaged William Entriken — the lead author of the ERC-721 NFT standard — as a paid consultant to co-develop the proof-of-concept. The complete inventor's journey from conception through patent grants is documented in **Exhibit C**.

3. AminoChain has commercialized a platform called "Specimen Center" and a related "Donor Platform" that practice this exact architecture. AminoChain's own Terms of Service reference "digital assets stored in any non-custodial digital wallet managed on your behalf by AminoChain." AminoChain's CEO Caspar Barnes published a peer-reviewed paper describing "each donated sample... associated with a unique non-fungible token (NFT) on a blockchain." Both co-founders independently learned Mr. Uribe's patented BioNFT™ framework (USPTO Trademark Serial No. 90688204) directly from him, failed to respond to a royalty-free license, raised $7 million in venture capital, and publicly described, after formal notice, a planned donor token-incentive system (which its CEO called "amino coins," while stating "we haven't named it yet") layered on the same patented biospecimen-NFT platform. Acts of Mr. Barnes referenced throughout this Complaint were committed in his capacity as AminoChain's CEO

and are imputed to AminoChain under principles of corporate agency. A consolidated infringement-read summary of AminoChain's Specimen Center, Donor Platform, and source code is attached as **Exhibit AP**, cross-referencing the claim chart and the preserved source code. The preserved AminoChain source code is independently attached as **Exhibit V**. The non-fungible-token mechanics underlying such token rewards are explained at **Exhibit AG**, and AminoChain's token economy is documented at **Exhibit AC**.

4. Mr. Uribe seeks a judgment of infringement, enhanced damages for willful infringement under 35 U.S.C. § 284, a permanent injunction, and attorneys' fees under 35 U.S.C. § 285.

## II. THE PARTIES

5. Plaintiff Daniel Francisco Uribe is an individual residing in Palo Alto, California. He is the sole inventor and owner of the '808 Patent and a co-inventor (with William Buchanan) and owner of the '203 Patent. Mr. Uribe is the founder and CEO of GenoBank.io, Inc. He holds an MBA from IPADE Business School, an Executive Diploma from the Stanford Graduate School of Business, and completed the Data Law, Policy & Regulation program at the London School of Economics and Political Science. He is a PhD Candidate in Decentralized Biobanking at the University of Technology Sydney. In January 2023, he was invited as an expert panelist at the joint USPTO and U.S. Copyright Office roundtable on NFTs and Intellectual Property. Mr. Uribe's co-inventor on the '203 Patent, William Buchanan, is an individual residing in London, United Kingdom. He is a distinguished Professor of Applied Cryptography at Edinburgh Napier University, an Officer of the Order of the British Empire (OBE) for services to cybersecurity, who co-developed the privacy-preserving cryptographic and Bloom-filter features of the patented BioNFT™ family vault architecture. Mr. Buchanan is not a party to this action; he has consented in writing to Mr. Uribe's sole enforcement of the '203 Patent, as set forth in Section IV.E and in the Joint Inventor Agreement attached as **Exhibit D**.

*Uribe v. AminoChain, Inc. — Complaint for Patent Infringement*                    3

**6.** Defendant AminoChain, Inc. is a Delaware corporation with its principal place of business in New York, New York. AminoChain has raised approximately $7.8 million in venture capital, including a $5 million seed round led by Andreessen Horowitz (a16z crypto) announced September 25, 2024, with participation from Cercano Management, Antler, Plug and Play, Superscrypt, Alumni Ventures Group, Lightshift Capital, and others. AminoChain's acts alleged herein were directed, authorized, and ratified by its Chief Executive Officer and co-founder, Caspar Barnes, acting within the scope of his corporate authority.

## III. JURISDICTION, VENUE, AND STANDING

**7.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

**8.** Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because Defendant AminoChain, Inc. is a corporation organized under the laws of the State of Delaware and therefore resides in this District. *See TC Heartland LLC v. Kraft Foods Group Brands LLC,* 581 U.S. 258 (2017).

**9.** This Court has personal jurisdiction over Defendant AminoChain, Inc. because it is a Delaware corporation and is therefore subject to general personal jurisdiction in this District. *See Daimler AG v. Bauman,* 571 U.S. 117 (2014).

**10.** Mr. Uribe has standing under 35 U.S.C. § 281 to assert both Patents-in-Suit. He is the sole owner of all right, title, and interest in the '808 Patent. As to the '203 Patent, which he co-invented with William Buchanan, Mr. Uribe holds exclusive enforcement authority, including the exclusive right to sue, pursuant to the Joint Inventor Agreement attached as **Exhibit D**, the operative terms of which are set forth in detail in Section IV.E below. Mr. Buchanan is not, and need not be, a party. The Article III case-or-controversy requirement is satisfied by AminoChain's ongoing infringement of both Patents-in-Suit.

**11.** Plaintiff is not aware of any related cases pending in this District or any other district.

## IV. THE INVENTOR'S JOURNEY AND THE PATENTS-IN-SUIT

**12.** A. Conception and Early Patent Filings (2018–2019)

In 2018, Mr. Uribe conceived the idea of applying non-fungible tokens to biological specimens — recognizing that NFTs, unlike fungible tokens, could carry specimen-specific metadata, encode consent logic, and represent unique biological samples on a blockchain. On May 31, 2018, he filed U.S. Provisional Patent Application No. 62/678,894, entitled "An Anonymous DNA/RNA Biosample Kit That Utilizes Public Key Infrastructure, SHA256 Encryption and Blockchain to Relate and Keep Track of Corresponding Data Sets." On May 31, 2019, he filed Non-Provisional Application No. 16/428,700 claiming priority to this provisional, through registered patent counsel.

**13.** On July 25, 2019, Mr. Uribe filed a second U.S. Provisional Application No. 62/878,585, which became the priority basis for the '808 Patent. On September 25, 2020, he filed Non-Provisional Application No. 17/033,478. On January 15, 2021, Mr. Uribe and co-inventor William Buchanan filed Application No. 17/151,114, which became the '203 Patent.

**14.** In total, Mr. Uribe filed three patent applications covering the BioNFT™ architecture: the earliest-priority parent, Application No. 16/428,700, and the two later applications that matured into the patents-in-suit. Each was separately examined. Application No. 16/428,700, filed May 31, 2019 and claiming priority to the May 31, 2018 provisional, was examined by Examiner Janna Nicole Schultzhaus in Art Unit 1671, who in an Office Action dated February 12, 2024 confirmed the May 31, 2019 effective filing date for the non-fungible-token claims and rejected the fifteen pending claims solely under 35 U.S.C. § 112(a) for written description, expressly declining to reject under 35 U.S.C. § 101, § 102, or § 103. Application No. 16/428,700 was thereafter abandoned, as reflected in a Notice of Abandonment of approximately October 18, 2024, and it is not asserted in this action; Mr. Uribe references it

only to establish the family's 2018 to 2019 priority position and to show that the earliest examination of this subject matter drew no rejection under § 101, § 102, or § 103. The two asserted patents and the parent application share a common technical disclosure. U.S. Patent No. 11,915,808 B1 (issued from Application No. 17/033,478), examined by Examiner Katherine Kolosowski-Gager in Art Unit 3686, issued by **first-action allowance**: the Examiner issued a Notice of Allowance on October 24, 2023 with no office action rejection of any kind, no rejection under 35 U.S.C. § 101, and no claim amendment, and the patent granted February 27, 2024. Because the '808 Patent issued with no office action, no § 101 rejection, and no amendment, its claim scope is unencumbered by amendment-based prosecution-history estoppel or argument-based disclaimer. U.S. Patent No. 11,984,203 B1 (issued from Application No. 17/151,114) followed a path that Mr. Uribe pleads candidly and in full. On March 27, 2023 the Examiner issued a Non-Final Rejection that applied the complete *Alice* eligibility framework to these exact claims (Step 2A prong one and prong two, and Step 2B), asserting that the additional elements "merely generally link the abstract idea to a particular technological environment" and that "blockchain technology is well-understood, routine, conventional in the field," and that also rejected claim 1 under 35 U.S.C. § 103 over Lidsky (US 2020/076798) in view of Hoffman (US 2017/0053908). The Examiner did not reject the '203 application under 35 U.S.C. § 112. On September 27, 2023, the applicant amended the claims and argued, narrowing claim 1 to the specific ordered combination of an anonymous biospecimen extraction kit, a self-sovereign DNA fingerprint of at least fifty single-nucleotide polymorphisms, a local DNA vending-machine deposit, bloom-filter family tracking, and non-fungible-token ownership. The Examiner then withdrew the § 101 and § 103 rejections and issued a Notice of Allowance on January 10, 2024, and the '203 Patent granted May 14, 2024. The USPTO therefore applied the full *Alice* framework to this exact subject matter and, after amendment to the inventive ordered combination, allowed the claims. That allowance, following a fully reasoned eligibility rejection, is strong record evidence that the inventive ordered combination is more than well-understood, routine, and conventional, and that

whether it is conventional is a genuine question of fact that cannot be resolved on the pleadings under *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018). Mr. Uribe does not contend that the original '203 claims were eligible; the original claims were rejected, and eligibility attached to the amended, narrower claims. Mr. Uribe acknowledges that the September 27, 2023 narrowing amendments were made for reasons related to patentability and therefore cabin the scope of the amended '203 limitations, an estoppel confined to the '203's amended limitations that does not reach the separately prosecuted, separately examined, unamended '808 Patent. The full prosecution file wrappers for all three applications are publicly available on the USPTO Patent Center. (Exhibits A and B.)

15. B. Peer-Reviewed Publication (May 2020)

On May 30, 2020, Mr. Uribe (with co-author Gisele Waters) published "Privacy Laws, Genomic Data and Non-Fungible Tokens" in the *Journal of the British Blockchain Association* (JBBA) — the first peer-reviewed paper describing the use of ERC-721, ERC-1155, and ERC-998 NFT standards for genomic data management. This publication predates any publicly known work by AminoChain by more than three years and establishes Mr. Uribe as the originator of the BioNFT™ concept. A copy is attached as **Exhibit E**.

16. C. Collaboration with the Inventor of the NFT Standard (June 2020)

In June 2020, Mr. Uribe engaged **William Entriken** — the lead author of EIP-721, the Ethereum standard that created the ERC-721 non-fungible token framework — as a paid consultant under a formal NDA and Consulting Agreement to collaborate on the technical implementation of the BioNFT™ architecture. Together, they co-authored "Biosample permission token with non-fungible tokens" — a technical paper describing ERC-721 tokens for biospecimen consent tracking using 96 SNPs for unique donor identification. Entriken also delivered five blockchain feature-set analyses, a Solidity smart contract proof-of-concept, and physical product packaging designs for GenoBank.io's DNA collection kits. The complete documentation of this collaboration is attached as **Exhibit C**.

**17.** D. The Inventive Concept and Technical Improvement

The '808 and '203 Patents do not merely claim the abstract idea of "tracking biological samples on a blockchain." They claim a specific, non-conventional technical solution to a known technological problem in bioinformatics and decentralized networks. Prior to Mr. Uribe's invention, blockchain networks utilized fungible tokens (e.g., ERC-20) which are interchangeable and technically incapable of encoding specimen-specific metadata or executing individual consent logic. No prior company — including EncrypGen (2016), Genomes.io (2018), or Dwarna (2019) — used non-fungible tokens for biospecimen tracking. Mr. Uribe's patents introduced an inventive concept: utilizing the specific data structures of non-fungible tokens (ERC-721/ERC-1155) to cryptographically anchor unique physical biospecimens to provenance metadata, executing consent via smart-contract logic, and storing this architecture within private-key-controlled digital wallets.

**18.** This specific system architecture improves the functioning of the computer networks themselves by: (a) replacing data silos with a unified, decentralized provenance chain linking physical specimens to digital records; (b) enabling privacy-preserving cryptographic search via bloom filters (claimed in the '203 Patent) that allow anonymous queries across a distributed network without exposing donor identity; (c) creating hash-encrypted biometric identifiers ("Self-Sovereign Digital DNA Fingerprints" using at least 50 single-nucleotide polymorphisms) that enable specimen authentication without disclosing personal data; and (d) implementing hierarchical parent-child token structures (ERC-1155) for multi-generational biospecimen management that no prior system could achieve. These are not generic computer operations — they are specific technical improvements to how decentralized networks process, store, and protect biological data.

**19.** The non-conventional character of the claimed architecture is evident in the specific technical problem the asserted claims address. A system for tracking human biospecimens must reconcile two requirements that pull in opposite directions: applicable privacy

frameworks (HIPAA, the EU General Data Protection Regulation, and the California Consumer Privacy Act) call for donor anonymity and donor-administered, revocable consent over how a specimen and its data are used, while the scientific and regulatory integrity of a biospecimen depends on a tamper-evident, auditable chain of custody and provenance record that cannot be silently altered or back-dated. As of the priority date, conventional approaches forced a trade-off between these requirements: a centralized relational database could record provenance but, by design, permitted records to be rewritten, undermining the tamper-evidence that chain-of-custody integrity requires; conversely, writing donor information directly onto a conventional immutable ledger produced tamper-evidence at the cost of donor control over that information. Mr. Uribe alleges that no system in the art known to him reconciled these competing requirements using the particular combination of elements recited in the asserted claims.

20. The asserted claims recite that specific, non-conventional combination, and not any single generic computer component: a non-fungible token (ERC-721 or ERC-1155) drawn from a public blockchain that uniquely represents an individual physical biospecimen and carries its provenance metadata; encryption of the resulting datasets and their deposit into a digital repository associated with a private-key-controlled digital wallet; donor consent administered through that wallet; and, in the '203 Patent, a bloom-filter mechanism enabling anonymous, privacy-preserving search across the network together with a Self-Sovereign Digital DNA Fingerprint derived from at least fifty single-nucleotide polymorphisms. It was this ordered combination, anchoring a unique physical specimen to a non-fungible, provenance-bearing token under donor-held cryptographic control, that the prior fungible-token and centralized-database systems did not achieve.

21. Whether the particular combination of elements recited in the asserted claims was well-understood, routine, and conventional as of the priority date is a question of fact, and Mr. Uribe alleges that it was not. Consistent with that allegation, the United States Patent and

Trademark Office examined and issued both the '808 and '203 Patents without entering any rejection under 35 U.S.C. § 101. As to the '808 Patent specifically, Mr. Uribe alleges as a matter of fact that the claimed ordered combination, an access-controlled physical biospecimen intake and storage structure that binds a uniquely identified physical specimen to a non-fungible, provenance-bearing token held under the donor's own private key, was not well-understood, routine, or conventional as of the May 31, 2018 priority date. As pleaded in Paragraphs 15 through 19, no system in the art known to Mr. Uribe reconciled the competing requirements of tamper-evident provenance and donor-administered, revocable anonymity using this combination; Mr. Uribe's May 30, 2020 peer-reviewed publication in the *Journal of the British Blockchain Association* was the first peer-reviewed description of using non-fungible tokens for genomic data (Paragraph 15, **Exhibit E**), and his June 2020 collaboration with William Entriken, the lead author of the ERC-721 standard, to co-develop the biospecimen-permission-token implementation (Paragraph 16, **Exhibit C**) further evidences that the inventive ordered combination was a novel technical contribution rather than a conventional arrangement of known components. Whether that ordered combination was well-understood, routine, and conventional is therefore a disputed question of fact that cannot be resolved against Mr. Uribe on a motion to dismiss. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). As to the '203 Patent specifically, the Examiner's March 27, 2023 statement that "blockchain technology is well-understood, routine, conventional in the field" was directed to blockchain technology in the abstract and to the original, broader claims that were rejected and thereafter superseded; it was not a finding that the amended, narrower ordered combination is conventional, and the Examiner withdrew the Section 101 rejection and allowed the claims only after that ordered combination was recited. That amended Claim 1 ordered combination, an anonymous biospecimen extraction kit, a Self-Sovereign Digital DNA Fingerprint created using at least fifty single-nucleotide polymorphisms, a local biospecimen deposit, a bloom filter for anonymous family search, and non-fungible-token

ownership, is not a generic invocation of blockchain but a specific, non-conventional arrangement, and Mr. Uribe alleges as a matter of fact that it was neither well-understood, routine, nor conventional as of the priority date. Each recited limitation supplies a concrete, non-generic technical property tied to that limitation: a non-fungible token is required because conventional ERC-20 fungible tokens are technically incapable of carrying the per-specimen provenance metadata and the per-token, revocable consent logic the claims require (Paragraph 17); the claimed bloom filter performs anonymous set-membership search across a distributed network without a central index, unlike a conventional database index, so that members of a family can detect biospecimen usage without exposing donor identity; and the at-least-fifty-SNP Self-Sovereign Digital DNA Fingerprint authenticates and links a donor's biospecimens without disclosing the donor's underlying genotype. Even if each component were individually known, the claimed ordered combination is a non-conventional *arrangement* of those components that solves the specific technical tradeoff between tamper-evident provenance and donor-administered, revocable anonymity described in Paragraph 19, and that inventive arrangement is itself an inventive concept under *Alice* step two. *See BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349–52 (Fed. Cir. 2016); *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014). Whether that ordered combination was well-understood, routine, and conventional is a question of fact that the incorporated prosecution record places in genuine dispute and that cannot be resolved against Mr. Uribe on a motion to dismiss.

**22.** E. The Issued Patents

On February 27, 2024, the USPTO issued U.S. Patent No. 11,915,808 B1 (the '808 Patent), entitled "Privacy-Preserving DNA/RNA/Microbiome/COVID-19 Test Kit Kiosk and Locker that Pairs to and Stores Results Data in Private Digital Wallet." Mr. Uribe is the sole inventor and owner of all right, title, and interest. The '808 Patent claims, *inter alia*, a system for creating "a non-fungible token (NFT) associated with a public blockchain and which

represents the personal biospecimen of the user and is created to include the set of provenance data associated with the personal biospecimen," linked to a private digital wallet controlled by the user's private key. Both patents are presumed valid under 35 U.S.C. § 282. A true and correct copy is attached as **Exhibit A**.

23. On May 14, 2024, the USPTO issued U.S. Patent No. 11,984,203 B1 (the '203 Patent), entitled "System and Processes for Anonymous DNA/RNA Biospecimen Tracking for Human Families Using Filters and Non-Fungible Tokens." Mr. Uribe and William Buchanan are co-inventors and co-owners of the '203 Patent. The '203 Patent claims a method for anonymous biospecimen tracking "that utilizes public key infrastructure, asymmetric encryption, and Non-Fungible-Tokens from a public Blockchain... to create a Self-Sovereign Digital DNA Fingerprint for each DNA donor," including "tokenizing the encrypted resulting datasets using a non-fungible token (for example, but not limited to, ERC1155) and storing with the shared family digital wallet." A true and correct copy is attached as **Exhibit B**.

24. Mr. Uribe has standing to bring this action under 35 U.S.C. § 281 with respect to both patents-in-suit, and the Article III case-or-controversy requirement is satisfied as Mr. Uribe has suffered concrete injury from AminoChain's ongoing infringement. As to the '808 Patent, Mr. Uribe is the sole inventor and sole owner of all right, title, and interest, and possesses all substantial rights, including the exclusive right to exclude others — satisfying the requirements of *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), and the patent-specific standing analysis of *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229–30 (Fed. Cir. 2019). As to the '203 Patent, Mr. Uribe and William Buchanan are the co-inventors and co-owners. To eliminate any procedural standing or joinder issue under *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–40 (Fed. Cir. 2007) and Federal Rule of Civil Procedure 19, Mr. Buchanan has provided his express, irrevocable written consent to Mr. Uribe's enforcement of the '203 Patent in Mr. Uribe's own name, as recorded in the Joint Inventor Agreement (**Exhibit D**, § 8A.4). Pursuant to the Joint Inventor Agreement (**Exhibit**

**D**, § 8A.4), Buchanan (a) consents to Mr. Uribe filing and prosecuting enforcement actions on the '203 Patent, (b) consents to Mr. Uribe's enforcement of the '203 Patent in Mr. Uribe's own name, and (c) irrevocably appoints Mr. Uribe as his attorney-in-fact to execute any documents necessary to respond to any standing challenge. That express, irrevocable co-owner consent satisfies both *Morrow v. Microsoft Corp.* and *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467–68 (Fed. Cir. 1998), rendering any standing challenge under FRCP 12(b)(1) or Rule 19 completely moot. Mr. Uribe executes and verifies this complaint on his own behalf, as the sole plaintiff and as the exclusive enforcement authority for the '203 Patent. Mr. Uribe's enforcement authority is set forth in the Joint Inventor Agreement effective May 14, 2024 (executed by Mr. Uribe on October 18, 2025, and by Buchanan on April 30, 2026, attached as **Exhibit D**; the "Joint Inventor Agreement"). Under the Joint Inventor Agreement: (a) **Section 1.1** grants Mr. Uribe exclusive licensing and enforcement authority; (b) **Section 1.3** prohibits Buchanan from independently licensing the '203 Patent; (c) **Section 8A.1** grants Mr. Uribe exclusive authority to initiate, prosecute, settle, and resolve all patent infringement actions; (d) **Section 8A.4** records Buchanan's express, irrevocable consent to joinder in this action and his appointment of Mr. Uribe as attorney-in-fact for enforcement purposes; and (e) **Section 8.3** selects Delaware law as the governing law. The Joint Inventor Agreement is effective *nunc pro tunc* to May 14, 2024 (the issue date of the '203 Patent), and confers retroactive enforcement authority on Mr. Uribe under the Federal Circuit's holding in *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071–74 (Fed. Cir. 2020) (a written assignment or transfer of enforcement rights executed prior to filing of suit confers standing, even where the underlying transfer was effective *nunc pro tunc*). The requirements of *Morrow v. Microsoft Corp.* (co-owners must join or consent) are fully satisfied by Buchanan's express, irrevocable written consent in the Joint Inventor Agreement (**Exhibit D**, § 8A.4). For the period between the '203 Patent issue date (May 14, 2024) and the execution of the Joint Inventor Agreement (October 18, 2025 / April 30, 2026), Mr. Uribe and Buchanan operated under a longstanding course of dealing and implied agreement under which Mr. Uribe managed all aspects of patent

prosecution, licensing, and enforcement on behalf of the joint inventorship; the Joint Inventor Agreement memorializes that pre-existing understanding. Buchanan has not contested, opposed, or sought to intervene in any aspect of Mr. Uribe's enforcement of the '203 Patent at any time, but has instead expressly consented to it.

25. The element-by-element correspondence between the asserted claims of the '808 and '203 Patents and AminoChain's accused "Specimen Center" and "Donor Platform" is set out in the claim charts attached as **Exhibit F**, which the Court may use as the roadmap for the infringement allegations that follow. **Exhibit F** maps each claim limitation to AminoChain's own source code, public statements, and published descriptions.

26. To the extent that 35 U.S.C. § 287(a) applies to the patents-in-suit, Mr. Uribe provided AminoChain (via its CEO Caspar Barnes and Chief Scientific Officer Jelani Clarke) with actual notice of the '808 and '203 Patents by formal written letter dated September 3, 2024 (transmitted by email on September 4, 2024 at 12:00 a.m. PDT to *caspar.barnes@aminochain.io* with copy to *jelani@aminochain.io*), identifying both patent numbers and alleging infringement (**Exhibit Q, Part 0**). Mr. Uribe seeks damages for infringement occurring on and after September 3, 2024. To the extent the asserted claims are method claims, the marking requirement of § 287(a) does not apply. The marking requirement is independently inapplicable to the '808 apparatus claims because Mr. Uribe has not made, used, offered to sell, or sold any product embodying the '808 Patent; where a patentee sells no patented article, § 287(a) imposes no marking duty. *See Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387 (1936); *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1219–20 (Fed. Cir. 2002). *See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009).

## V. FACTUAL BACKGROUND

27. V.A. First-Party Admissions That AminoChain Practices the Patented Architecture

Before the chronology of willfulness set out below, the Court need look no further than AminoChain's own words, code, and publications. The dispositive proof in this case is not Plaintiff's characterization of what AminoChain does; it is AminoChain's own first-party, objective admissions that it builds and operates the patented architecture: associating an individual biospecimen with a non-fungible token ("NFT") on a blockchain, placing those tokenized samples on a decentralized marketplace, and paying donors when their samples are transacted. Each admission below was authored by AminoChain or its CEO, Caspar Barnes, and is corroborated by a contemporaneous, independently verifiable source.

28. AminoChain's own source code admits the core invention. AminoChain published its smart-contract source code, including the file *AminoChainDonation.sol*, on its public GitHub repository. That contract is an ERC-721 (non-fungible token) implementation that mints a unique token to represent each donated biospecimen. (**Exhibit G**.) ERC-721 is the non-fungible token standard; AminoChain's election of ERC-721, rather than a fungible (ERC-20) standard, is an engineering admission that each token must be unique to a single sample and must carry sample-specific metadata. This source code maps element-for-element to the "non-fungible token (NFT) associated with a public blockchain and which represents the personal biospecimen" limitation of Claim 1 of the '808 Patent, as charted in **Exhibit F**.

29. AminoChain's CEO admitted the architecture on camera. At DeSci Berlin on June 17, 2024, Mr. Barnes described AminoChain's system in his own voice: the AminoChain node software "mints an NFT out of that sample," so that a biobank ends up with "50,000 NFTs that represent those samples," with each NFT placed "onto a decentralized biosample Marketplace" that he named "the specimen Center which is our Marketplace." He further admitted that donors "track where they go" and "earn royalties whenever their samples are transacted upon," all under what he called "personalized consent." (**Exhibit H**, DeSci Berlin, June 17, 2024.) Plaintiff is candid with the Court about the scope of this admission: the video establishes the NFT-tokenization core common to both patents, and the claim-element map at

**Exhibit F** ties each quoted statement to the corresponding limitation. The video does not, standing alone, prove the '808 Patent's physical kiosk sensor elements or the '203 Patent's shared family-wallet, ≥50-SNP fingerprint, and bloom-filter limitations; those limitations are established by the claim charts at **Exhibit F** and, where the correspondence is non-literal, by the doctrine of equivalents.

30. AminoChain admitted the architecture in a peer-reviewed publication, in writing, after notice. On November 5, 2024, after Plaintiff's cease-and-desist and license correspondence, Mr. Barnes and co-authors published "Enabling Demonstrated Consent for Biobanking with Blockchain and Generative AI" in the *American Journal of Bioethics*, stating that "each donated sample is associated with a unique non-fungible token (NFT) on a blockchain." (**Exhibit I.**) This is a written, post-notice admission, in a peer-reviewed journal of record, of the precise biospecimen-to-NFT mapping claimed by the '808 and '203 Patents, and it forecloses any contention that AminoChain's practice of the invention was inadvertent or transient.

31. The same publication reveals AminoChain's deliberate citation misdirection. While admitting the patented biospecimen-NFT architecture, the November 5, 2024 paper cited GenoBank.io merely as one of several generic "genomic vault" platforms, alongside Genomes.io and LunaGenomics, rather than disclosing that AminoChain was practicing the patented biospecimen-tracking architecture that Plaintiff had personally explained to Mr. Barnes and Mr. Clarke and had reduced to issued United States patents. (**Exhibit J.**) The citation analysis at **Exhibit J** shows that AminoChain knew of, and selectively characterized, Plaintiff's work: it cited Plaintiff's platform for the unremarkable proposition that genomic data can be vaulted, while omitting the patented invention it was in fact implementing. That selective citation, post-dating actual notice, is probative of willfulness and of AminoChain's knowledge that its architecture was not its own.

32. B. Knowledge and the Timeline of Willfulness

November 17, 2022: AminoChain's co-founder and Chief Scientific Officer, Jelani Clarke, initiated contact with Mr. Uribe, stating he had seen Mr. Uribe speak at DeSci SF22. Mr. Uribe explained that "our BioNFTs represent digital & distribution rights over Biospecimens and are the only NFTs in DeSci that have been peer-reviewed" and shared his JBBA publication. On November 22, they held a Zoom call. On November 24, Clarke specifically requested Mr. Uribe's pitch deck. On December 1, 2022, Mr. Uribe shared his complete BioNFT™ pitch deck ("BioNFT's Genomics 3.0"), which included slides titled "BioNFT — World's 1st Biosample Consent NFT," "3 Patents (pending)," and the full patented architecture. (**Exhibit K.**)

**33.** May 25, 2023: Clarke and Mr. Uribe discussed speculative tokenomics in DeSci. Clarke stated: "I absolutely agree. Science should be tested and not trusted." AminoChain subsequently adopted the exact speculative tokenization Clarke agreed was harmful. (**Exhibit K.**)

**34.** June 21, 2023: In a public "Blockchain For Science" channel, Mr. Uribe challenged AminoChain's claim to be the "world's first web3 biosample tracking platform." Caspar Barnes, AminoChain's Chief Executive Officer and co-founder, responded: "by no means meant to step on anyones toes. I'll go ahead and remove the post." In the same June 2023 communications, Mr. Uribe sent Barnes an image of his patent application and also sent Barnes the link to his prior public disclosure, a September 24, 2019 article published in Open Access Government titled "Distributive biobanking models: Why biospecimens need blockchain," writing: "This is an oldie, but goodie...(Sept 2019)," and providing the URL www.openaccessgovernment.org/distributive-biobanking-models/73910/. Mr. Uribe identified his co-authorship and pointed Barnes to the article's central figure, stating that he co-authored the article with a former President of the International Society for Biological and Environmental Repositories (ISBER) and that the article "has a good diagram." (The co-author's name is redacted in Exhibit N for privacy.) That article contains Figure 1, expressly

attributed to GenoBank.io and captioned: "Figure 1: Proposed steps in a biospecimen-informatics blockchain developed by Genobank.io to tokenize biospecimens and its corresponding DNA/RNA datasets." Figure 1 sets out the same numbered, step-by-step architecture, identical in structure to the figures of the patents-in-suit, in which a donor and the donor's DNA create a digital BioWallet secured by a public address and a private key, a biospecimen is placed into a barcoded or QR-coded tube, the donor scans the tube code to create a unique non-fungible token in the BioWallet carrying provenance metadata including location, expiration date, brand, and date and time, a laboratory extracts the DNA and RNA, the resulting datasets are encrypted and tokenized by a further non-fungible token to claim ownership, and the transactions are recorded on a public blockchain. Barnes confirmed that he received and reviewed the article, replying: "Awesome thank you so much that paper looks great!" and "Have booked us a time hasta pronto." On June 29, Barnes attended a video meeting where Mr. Uribe explained the BioNFT framework in detail. (Exhibit N.)

**35.** August 15, 2023: Barnes contacted Mr. Uribe: "I'm writing a paper at the moment on blockchain-based technologies and research consenting... I of course would like to mention your Framework of BioNFTs." Barnes thereby recognized Mr. Uribe's framework by name, in writing, as a distinct and attributable innovation belonging to Mr. Uribe, less than two months after Mr. Uribe had supplied Barnes with both the image of his patent application and the September 24, 2019 GenoBank.io-attributed Figure 1 described in Paragraph 34, and after Barnes had acknowledged that "that paper looks great!" By no later than June 2023, therefore, Barnes, then AminoChain's Chief Executive Officer and co-founder, had in hand a 2019-dated, publicly published, GenoBank.io-attributed technical diagram depicting the tokenization of biospecimens and their derived DNA and RNA datasets as non-fungible tokens carrying provenance metadata on a public blockchain, the same concrete system architecture later

embodied in the asserted patents. Barnes's actions and knowledge were undertaken in his capacity as AminoChain's Chief Executive Officer and co-founder and are imputed to AminoChain under principles of corporate agency. (Exhibit N.)

36. The September 24, 2019 article and its GenoBank.io-attributed Figure 1 were published more than three years before any publicly known work by AminoChain and before AminoChain built and marketed its accused product. The article was co-authored with subject-matter experts in biobanking, including a former President of the International Society for Biological and Environmental Repositories (ISBER). Figure 1, attributed to GenoBank.io, the company of which Mr. Uribe is the founder and Chief Executive Officer, reduces to a published, numbered engineering diagram the same step-by-step architecture, identical in structure to the figures of the patents-in-suit, in which a donor-controlled BioWallet secured by a private key, a uniquely identified physical biospecimen, and a non-fungible token cryptographically anchoring that specimen and its derived datasets to provenance metadata are recorded on a public blockchain. This corroborates that Mr. Uribe conceived and publicly disclosed the claimed tokenized-biospecimen architecture years before AminoChain existed and confirms Mr. Uribe as its originator, consistent with the priority and originality allegations in Paragraphs 12 through 15. Mr. Uribe references the 2019 article solely to corroborate origin, priority, and AminoChain's knowledge, and not as prior art; the architecture there disclosed is Mr. Uribe's own and is the subject matter that matured into the patents-in-suit.

37. AminoChain cannot credibly maintain that it independently and contemporaneously arrived at the same architecture in ignorance of Mr. Uribe's work. In the same 2023 communications in which Barnes received Mr. Uribe's 2019 GenoBank.io-attributed Figure 1, Barnes admitted to Mr. Uribe: "Just full transparency tho we are honestly no where yet and have got next to nothing figured out." AminoChain's Chief Executive Officer thus, in his own words and at the very time he was handed Mr. Uribe's published architecture, disclaimed having figured out the technology, then proceeded to build, raise capital for, and market a

commercial platform embodying that same architecture. These facts foreclose any independent-development account and support the inference that AminoChain's accused architecture was not its own, corroborating Mr. Uribe's allegations of copying and willfulness. (Exhibit N.)

38. Because Barnes received and reviewed Mr. Uribe's GenoBank.io-attributed Figure 1 and the image of Mr. Uribe's patent application in June 2023, AminoChain, through its Chief Executive Officer and under principles of corporate agency, had actual knowledge of Mr. Uribe's published BioNFT architecture and of its origin with Mr. Uribe and GenoBank.io no later than June 2023, and confirmed that knowledge again on August 15, 2023 by asking to cite Mr. Uribe's framework by name. That June 2023 knowledge was knowledge of Mr. Uribe's published architecture and of his pending patent application; the '808 Patent had not yet issued (it issued February 27, 2024) and the '203 Patent had not yet issued (it issued May 14, 2024). AminoChain's continued building, operating, and promoting of the accused product, and its inducement of participating laboratories, donors, and partners to use it, after the '808 and '203 Patents issued and after the formal notices pleaded in Paragraphs 42 through 44, were undertaken with knowledge of the patented architecture and its provenance and in disregard of Mr. Uribe's patent rights, supporting a finding of willful infringement and an award of enhanced damages under 35 U.S.C. § 284. AminoChain's officer Jelani Clarke separately solicited Plaintiff's biospecimen-NFT and biobanking work as early as November 17, 2022, and his named officer role at AminoChain is documented in **Exhibit AR**; the full Clarke and Barnes communications are at **Exhibit K**.

39. The September 24, 2019 publication of Figure 1 further corroborates that the subject matter claimed in the asserted patents is a concrete, non-abstract technical architecture rather than an abstract idea. As alleged in Paragraphs 17 through 21, the asserted claims recite a specific, non-conventional ordered combination, a donor-controlled digital wallet secured by a private key, a uniquely identified physical biospecimen, and a non-fungible token that

cryptographically anchors that specimen and its derived datasets to provenance metadata on a public blockchain, and not the abstract idea of tracking biological samples on a blockchain. Figure 1 reduces that architecture to a defined, enumerated sequence of technical steps with specified data structures, key management, and on-chain operations, which is the antithesis of an abstract idea. This is consistent with the prosecution record of the asserted patents already pleaded in Paragraph 14: the '808 Patent issued from Application No. 17/033,478 by first-action allowance, with no office action and no rejection under 35 U.S.C. § 101, and the '203 Patent issued from Application No. 17/151,114 after the Examiner's Alice-framework rejection under § 101 was overcome by amendment to the inventive ordered combination and then withdrawn. The 2019 article is offered here solely to corroborate the concreteness of the claimed architecture and AminoChain's knowledge of it, and not as a statement concerning novelty or obviousness.

**40.** October 2023: AminoChain raised a $2 million pre-seed round. Julianne Roseman, Principal at Plug and Play Tech Center (an investor), confirmed: "AminoChain spoke with us of biosample NFTs back during their pre-seed fundraise." Roseman attached an image from AminoChain's pitch deck bearing the caption **"Turn bio-specimen donations into NFTs."** (**Exhibit O.**)

**41.** February 23–March 5, 2024 (Continued Direct Contact During '808 Patent Issuance): On February 23, 2024, AminoChain's CEO Caspar Barnes sent Mr. Uribe (and his co-founder Jelani Clarke and third-party Robert Hewitt of Biosample Hub UK) a Google Calendar invitation for a meeting on Wednesday, February 28, 2024, at 12:00 PM PST. The '808 Patent issued on the immediately preceding day (February 27, 2024). The Feb. 28, 2024 meeting was held by Google Meet at meet.google.com/bzb-tzuw-shc; Mr. Uribe and Mr. Barnes both attended. On March 1, 2024, Barnes followed up by email (with Mr. Uribe copied), describing the AminoChain platform to Hewitt: "the whole AminoChain platform 'decentralises' the bio-sample procurement process, and thereby cuts brokers out of the equation," signed "Caspar

Barnes, Founder & CEO, AminoChain." Barnes proposed scheduling a call "to discuss a pilot implementation." Further follow-up emails between Barnes, Mr. Uribe, Hewitt, and Clarke followed on March 5, 2024, March 6, 2024, March 18–19, 2024, and March 26, 2024. This sequence establishes that Mr. Uribe and AminoChain's officers maintained continuous direct contact during and immediately after the issuance of the '808 Patent — the same period during which AminoChain was actively pitching its commercial platform to third parties as "decentralising the bio-sample procurement process." (**Exhibit N**; further detail in Verified Email Archive, May 19, 2026.)

42. September 3, 2024: Mr. Uribe sent a formal letter, dated September 3, 2024, to AminoChain's CEO Caspar Barnes (with copy to Chief Scientific Officer Jelani Clarke) addressed to AminoChain's principal place of business at 368 9th Avenue, New York, NY 10001, identifying U.S. Patent Nos. 11,984,203 and 11,915,808 by number, alleging infringement based on AminoChain's "Biosample NFTs" and consent-tracing technology as described in AminoChain's public statements and fundraising materials, offering a nonexclusive license, stating damages of "no less than $7 million USD" in the absence of a license, and requesting a response within fourteen (14) days from the date of the letter (i.e., by September 17, 2024). The letter was transmitted by email on September 4, 2024 at 12:00 a.m. PDT to *caspar.barnes@aminochain.io* and copied to *jelani@aminochain.io*. (**Exhibit Q, Part 0.**)

43. September 16, 2024: AminoChain's outside intellectual-property counsel, Frank L. Gerratana of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin"), responded to Mr. Uribe's September 3, 2024 letter on AminoChain's behalf. The Mintz Levin response (a) confirmed that the firm "has been engaged to represent AminoChain, Inc. in connection with your letter dated September 3, 2024"; (b) acknowledged Mr. Uribe's allegation that AminoChain "may infringe one or more claims of U.S. Patent Nos. 11,984,203 and 11,915,808"; (c) did not deny infringement on the merits; (d) instead demanded that Mr. Uribe

provide a "detailed limitation-by-limitation analysis (preferably in the form of a claim chart)"; and (e) did not accept the license offer, did not propose any counter-license, and did not represent that AminoChain would cease the accused activity. AminoChain's retention of top-tier patent counsel within twelve (12) days of receiving Mr. Uribe's letter demonstrates AminoChain's subjective awareness of the seriousness of the allegations and constitutes additional evidence of subjective knowledge of the asserted patents. (**Exhibit Q, Part 0b**.)

44. September 25, 2024: Eight days after the 14-day response deadline (September 17, 2024) elapsed without AminoChain accepting the license offer or substantively engaging on the merits of the infringement allegations, AminoChain publicly announced a $5 million seed round led by a16z crypto. AminoChain participated in a16z's CSX accelerator program, whose curriculum includes "Decentralizing & tokenizing your protocol" and token launch infrastructure. (**Exhibits V, AH**.)

45. September 27, 2024 (AminoChain's Counterstrike C&D): Two days after announcing the $5 million seed round, AminoChain's outside intellectual-property counsel (a separate Mintz Levin attorney, Peter A. Biagetti, Member) sent Mr. Uribe an email at 3:20 PM with the subject line *"Daniel Uribe — Cease and Desist Letter"* and stating: "On behalf of Peter Biagetti, attached please find a Cease and Desist Letter with respect to AminoChain." The email and attached letter, sent by Kathy O'Connell (Assistant) on Mr. Biagetti's behalf, was copied to Daniel J. Goodrich and Frank L. Gerratana (additional Mintz Levin attorneys). This represents AminoChain's attempt to reverse the legal pressure by demanding that Mr. Uribe cease his patent-enforcement activity. AminoChain neither accepted the license, paid the proposed damages, nor ceased the accused activity. (**Exhibit R**.)

46. September 29, 2024 (AminoChain's Intimidation Follow-Up): Mr. Biagetti (Mintz Levin) sent Mr. Uribe a second email instructing: "I understand that you have told third parties that you are sending an 'agreement' to AminoChain. Please refrain from asking anyone to 'witness' that sending, and from making any related requests or statements. If you or your counsel have

anything to share with AminoChain, please email it to me and I shall confirm receipt of it." This communication constitutes a direct attempt to silence Mr. Uribe and prevent third-party witnesses from observing AminoChain's refusal to engage with the license proposal — conduct that is itself evidence of consciousness of guilt and a deliberate effort to suppress public knowledge of the dispute. (**Exhibit R**.)

**47.** September 30, 2024: Notwithstanding the Mintz Levin deflection and the expiration of the original 14-day deadline, Mr. Uribe sent a substantive follow-up email at 7:17:40 a.m. PDT directly to *caspar.barnes@aminochain.io* with copy to *jelani@aminochain.io*, presenting three options in the following terms:

- **Option 1 — Discontinue the Use of Biosample NFTs:** "Cease using Biosample NFTs and refrain from associating them with any volatile ERC20 tokens or speculative business models that could incentivize unethical practices like human biosample trafficking."

- **Option 2 — Review and sign the proposed agreement** (an attached draft zero-dollar, royalty-free, non-exclusive license agreement), under which Mr. Uribe was willing to grant a free license on the following conditions: (a) "Avoid using Biosample NFTs as unregistered securities or to build a vulgar Biosample Casino"; (b) "Refrain from fractionalizing them or linking them to speculative ERC20 tokens, volatile rewards, or any tokenomics that could incentivize unethical activities"; (c) "Ensure compliance with AML/KYC regulations from regulatory bodies like the SEC, similar to the Reg A+ framework used by protocols such as Stacks"; and (d) "Do not list any related tokens on decentralized exchanges that bypass KYC measures, as this could expose retail investors to undue risk and circumvent important regulatory safeguards."

- **Option 3 — Proceed to Legal Action,** with Mr. Uribe stating: "If we cannot reach an understanding, I am prepared to defend my intellectual property rights and uphold ethical standards in court… especially when a license is being offered at no cost, zero, nada!"

**48.** AminoChain did not accept Option 2 and did not cease the conduct described in Option 1, leaving Option 3 as the only remaining path. (**Exhibit Q, Part 1.**)

November 5, 2024: Barnes published a peer-reviewed paper in the *American Journal of Bioethics* as first author, stating: "Each donated sample is associated with a unique non-fungible token (NFT) on a blockchain, which records in its metadata information about the planned and past uses of the sample in research." This paper was published while the license dialogue was ongoing, without proper attribution to Mr. Uribe's foundational 2020 JBBA publication on the core NFT-biospecimen concept. (**Exhibit I.**)

**49.** November 8, 2024: Following AminoChain's failure to accept any of the three options previously presented, to substantively engage on the merits, or to cease the infringing activity, Mr. Uribe formally revoked the free license offer. (**Exhibit Q, Part 2.**)

**50.** January 29, 2025 (First Escalation to a16z Crypto Legal): Following AminoChain's continued use of the patented technology after the November 8, 2024 revocation, Mr. Uribe sent a written communication to a16z crypto's legal team (*legal@a16zcrypto.com*) titled "Urgent: Patent Infringement Concerns Regarding AminoChain Investment — Request for Meeting." The communication identified U.S. Patent Nos. 11,984,203 and 11,915,808 by number, identified the September 2024 license offer and the absence of response, and explicitly stated: "The investment deal, led by Arianna Simpson, was based on pitch materials that directly incorporate our patented Biosample NFT technology without license or attribution." a16z crypto did not respond. (**Exhibit U.**)

**51.** April 24, 2025 (Second Escalation to a16z Crypto Legal): Mr. Uribe sent a follow-up communication to *legal@a16zcrypto.com* titled "Follow-up: Patent Infringement Matter — AminoChain (Time Sensitive)," noting: "Since my initial outreach, we have observed continued promotion of technology covered by our patents in AminoChain's public communications." Mr. Uribe further stated: "Our counsel has advised us on next steps, but we still prefer an amicable business resolution." a16z crypto did not respond. (**Exhibit U.**)

52. April 28, 2025 (Harvard Blockchain Conference Excludes Barnes from Panel): Following Mr. Uribe's communications with the conference organizers, the Harvard Undergraduate Blockchain Conference proceeded with its DeSci Enterprise BioMed panel **without Caspar Barnes**, after reviewing the evidence Mr. Uribe submitted regarding patent infringement and academic-attribution concerns. This independent third-party determination by a prominent academic institution corroborates the seriousness of the conduct alleged herein. (**Exhibit X.**)

53. May 8, 2025 (Industry Escalation and Independent Investigations): Mr. Uribe sent a comprehensive 13-page communication to leadership of the International Society for Biological and Environmental Repositories ("ISBER"), specifically to Marianne K. Henderson (Senior Advisor on Biobanking, National Cancer Institute; Chair, ISBER AI/Blockchain/ Digital Twins Group), with copies to additional ISBER leaders, detailing AminoChain's continued use of the patented technology, including a side-by-side comparison of AminoChain's ISBER 2025 promotional "Specimen Center" interface against GenoBank.io's pre-existing Web3 Biosample Explorer. The communication confirmed that (a) Taylor & Francis, the publisher of the *American Journal of Bioethics*, opened a formal research-integrity investigation into the Barnes AJOB paper on March 8, 2025 (per communication from Dr. Fulu Akinduro-Aje, Research Integrity Manager); and (b) two independent academic critiques of the Barnes AJOB paper were published in the same journal: McNealy and Doerr, "Challenges to Demonstrated Consent in Biobanking," and Samuel et al., "Technologies Do Not Build Trust, People Do." (**Exhibit Y.**)

54. June 17, 2025: After revocation, AminoChain publicly posted on Twitter/X: "But their metadata, what they are, who can access them, how they were collected, becomes searchable and standardized across a decentralized network." This is the strongest public admission that AminoChain continued operating the patented NFT-linked metadata architecture — "searchable and standardized" provenance metadata on a "decentralized network" — months after receiving formal notice that the license had been revoked. (**Exhibit Z.**)

**55.** October 8, 2025: At a Syndicate event in San Francisco, AminoChain announced it had "launched their own chain" — a dedicated appchain for biospecimen tokenization. At or around the same time, AminoChain exhibited at the American Society of Human Genetics (ASHG) 2025 annual meeting, marketing the infringing platform to the genomics research community. These actions demonstrate that AminoChain did not merely continue but actively doubled down on the infringing architecture after revocation. (**Exhibits Z, AH.**)

**56.** December 4, 2025: Mr. Uribe sent a 17-page formal notice to a16z crypto detailing the patent infringement, the timeline of willfulness, and the rejected license. The notice included a 30-day response deadline of January 3, 2026. (**Exhibit W.**) AminoChain's continued, post-correspondence promotion of the accused Specimen Center network and biobank partners through 2025 is collected at **Exhibit AQ**.

**57.** December 31, 2025 (Final Pre-Suit Personal Appeal): Three days before the 30-day deadline established in the December 4, 2025 formal notice expired, Mr. Uribe sent a final pre-suit personal appeal at 4:04 PM PST directly to Arianna Simpson (*arianna@a16z.com*, *asimpson@a16z.com*), with copies to six additional a16z addresses including Associate General Counsel Zach Gray (*zgray@a16z.com*), with the subject line: "Personal Appeal Regarding AminoChain — January 3rd Deadline Approaching (Following Up on December 4th Formal Notice)." Receipt was confirmed by Mr. Gray's automated Out-of-Office reply at 3:12 PM PST the same day, providing his direct contact number [redacted]) and identifying his title as "Associate General Counsel." a16z crypto did not provide a substantive response before the January 3, 2026 deadline expired. (**Exhibit U.**)

**58.** March 31, 2026: Barnes appeared on Antler's "The Further, Faster Podcast" and (a) described the patented invention as his own ("we thought let's turn donated bio samples into NFTs... encode metadata into these tokens" — 10:04); (b) revealed the playbook he used on Mr. Uribe ("say that you're writing a master's thesis... get an introductory call" — 16:11); (c)

acknowledged body-commoditization risks while describing a planned, not-yet-named donor token-incentive he called "amino coins" (35:46–37:37); and (d) stated: "there are no rules. Like there's literally no rules" (42:50). (**Exhibit AA**.)

59. September 2025 to March 2026: AminoChain publicly launched its "AminoChain Protocol" token-economy model for biobanking, under which donors "share in… the commercial value of their donated bio samples and data" (**Exhibit AC**); and on Antler's "Further, Faster" podcast, AminoChain's CEO described a planned, not-yet-named donor token-incentive he called "amino coins" layered on that platform (**Exhibit AA**, 35:46–37:37).

60. **Objective Indicia of Non-Obviousness:** The validity and non-obviousness of Mr. Uribe's patented architecture are objectively demonstrated by the industry's reaction. AminoChain failed to independently develop a solution; instead, both co-founders explicitly sought out Mr. Uribe to learn the "Framework of BioNFTs." Clarke requested and received the complete pitch deck and peer-reviewed publication (December 2022). Barnes acknowledged Mr. Uribe's framework by name and requested permission to cite it (August 2023). AminoChain subsequently raised approximately $7.8 million from sophisticated venture capital — including $5 million from a16z crypto — based entirely on commercializing this exact patented architecture. AminoChain's business partner CloudLIMS publicly described the technology as "turn[ing] donated biomaterials into Non-Fungible Tokens (NFTs)." AminoChain's rapid adoption, commercial success, and praise of the BioNFT™ framework demonstrate that the invention was a non-obvious technical breakthrough in the field of decentralized biobanking. (**Exhibit AD**.)

## VI. LITERAL INFRINGEMENT OF THE '808 PATENT

61. In November 2024, AminoChain's CEO Caspar Barnes published a peer-reviewed academic paper detailing the exact architecture of the AminoChain platform. In January 2026, AminoChain's own Terms of Service described its wallet and digital-asset architecture.

AminoChain's own descriptions of their product are a verbatim match to the asserted claims, mapped by patent and claim in the table below (the '808 Patent for the NFT, provenance-data, and private-digital-wallet limitations, and the '203 Patent for the Self-Sovereign DNA Fingerprint and consent-tracking limitations):

62. Patent Claim Element (patent identified per row)AminoChain's Own Words

'808 Claim 1: "a non-fungible token (NFT) associated with a public blockchain" Barnes (2024): "a unique non-fungible token (NFT) on a blockchain" Barnes, Antler podcast (2026): "we thought let's turn donated biosamples into NFTs" CloudLIMS: "turn donated biomaterials into Non-Fungible Tokens (NFTs)"

'808 Claim 1: "which represents the personal biospecimen of the user" Barnes (2024): "Each donated sample is associated with a unique non-fungible token" Pitch deck: "Turn bio-specimen donations into NFTs"

'808 Claim 1: "created to include the set of provenance data associated with the personal biospecimen" Barnes (2024): "records in its metadata information about the planned and past uses of the sample in research" Donor Platform: "Create verifiable links from consent → sample → derived data"

'808 Claim 1 (preamble): "a private digital wallet" that stores the retrieved data ToS (Jan 2026): "digital assets stored in any non-custodial digital wallet managed on your behalf by AminoChain"

'203 Claim 1: "consent to use" tracked on the blockchain (consent enforced through smart-contract logic; '203 Patent) Gate.io: "preferences around consent; who can use it, for what purpose, and for how long. These preferences are enforced via smart contracts"

'203 Claim 1: "Self-Sovereign Digital DNA Fingerprint" for each donor using at least fifty SNPs (hash-encrypted genetic identifier; '203 Patent) Devpost (2022): "encrypted HLA data as a struct of hashes corresponding to each of their HLA genes" — HLA alleles are genetically defined by SNP-level variation; functionally equivalent to the claimed 50-SNP fingerprint

Each element of Claim 1 of the '808 Patent is practiced by AminoChain's Specimen Center, Donor Platform, and at-home biospecimen kits. AminoChain's accused system practices each element of the asserted claims, as mapped element-by-element in **Exhibit F**. The prior non-NFT systems (EncrypGen, Genomes.io, Dwarna) used fungible tokens or no tokens and did not represent individual biospecimens as non-fungible tokens; the asserted claims recite a specific, non-conventional architecture, not the abstract idea of tracking samples.

**63. Source Code Confirmation.** The infringement is not merely admitted in marketing materials and academic publications — it is confirmed at the source-code level. AminoChain's preserved GitHub repository (five repositories totaling 43 MB, captured before website scrubbing) contains a Solidity smart contract named AminoChainDonation.sol, which implements the ERC-721 standard and exposes a mint(RegistrationData) function. The RegistrationData struct encodes: (a) hlaHashed — a struct of five HLA loci (A, B, C, DPB, DRB), each stored as a bytes32 cryptographic hash, which constitutes a privacy-preserving biometric identifier functionally equivalent to the claimed "Self-Sovereign Digital DNA Fingerprint"; (b) donor — a blockchain wallet address, i.e., a private-key-controlled digital wallet; (c) biobank — the custodial institution address; and (d) genomeEncodedIpfsId — a pointer to the encrypted genomic dataset. The contract emits an NFTMinted event recording (donor, hlaHashed, tokenIds, amounts) and provides getter functions getHlaHashed(tokenId) and tokenIdToDonationData(tokenId) — provenance-tracking metadata embedded in the non-fungible token exactly as claimed. The companion subgraph indexes these tokens under the entity name StemCellDonationTokenized — literally "tokenizing stem cell donations" using NFTs. This source code literally implements the non-fungible-token and provenance-data

limitations of Claim 1 of the '808 Patent (the NFT "associated with a public blockchain and which represents the personal biospecimen… created to include the set of provenance data"), and it literally implements core limitations of Claim 1 of the '203 Patent, including the "Self-Sovereign Digital DNA Fingerprint," the public-key/asymmetric-encryption scheme, and the tokenization of the encrypted resulting datasets: the hlaHashed struct is the privacy-preserving genetic fingerprint, the donor wallet address is the donor-held digital wallet, and genomeEncodedIpfsId is the encrypted-dataset repository pointer. The remaining physical-apparatus limitations of the '808 Patent (the locker boxes, touchscreen, camera, environmental and GPS sensors, printer, and metal outer kiosk body) are addressed under the doctrine of equivalents in ¶ 66 below. (**Exhibit G.**)

**64. Consciousness of Guilt — Website Scrubbing.** After receiving notice of infringement, AminoChain systematically scrubbed NFT-related language from the AminoChain website. A before-and-after comparison of the public-facing language demonstrates that terms such as "NFT," "non-fungible token," "tokenization," and "blockchain" were removed from marketing materials, replaced with euphemisms such as "digital assets" and "research assets." AminoChain's CEO nonetheless continued to use explicit non-fungible-token framing when describing the platform on the March 2026 Antler podcast. The scrubbing demonstrates that AminoChain (acting through its officers, including Barnes and Clarke) was fully aware their technology practiced Mr. Uribe's patents and attempted to conceal this fact rather than design around the patented claims. (**Exhibit Z.**)

**65. Deliberate Citation Misdirection — Barnes AJOB Paper.** AminoChain's CEO Caspar Barnes's peer-reviewed paper in the *American Journal of Bioethics* (November 5, 2024) contains 75 bibliographic references and describes an architecture identical to Mr. Uribe's patents. The paper does cite Mr. Uribe's 2020 JBBA publication — but only as reference [60], in the narrow context of GDPR right-to-erasure compliance, not for the foundational concept of using non-fungible tokens to represent biospecimens on a blockchain. The paper

acknowledges that "[p]latforms like Genobank... demonstrate the utility of blockchain-based transparency, immutability, and auditability" but dismisses these as "often limited to genomic data" — thereby demonstrating that Barnes was fully aware of Mr. Uribe's prior work and deliberately avoided crediting it as the origin of the core innovation he was commercializing. This is worse than a simple omission: Barnes knew about Mr. Uribe's work (he cited it), knew about GenoBank's platform (he named it), and chose to relegate the citation to an unrelated point while claiming the NFT-biospecimen concept as his own. Barnes had also personally requested and received Mr. Uribe's research materials by name ("Framework of BioNFTs") in August 2023 (**Exhibit N**), and the paper was submitted and published after the September 2024 cease-and-desist. The citation misdirection constitutes evidence of willfulness and a deliberate attempt to misrepresent the origins of the technology to the academic community. (**Exhibit J**; **Exhibit J**.)

**66. Citation Omission — AminoChain Paper and Broader Industry Pattern.** The Barnes AJOB paper (November 2024) is the principal publication of AminoChain's CEO and is the paper whose citation misdirection is squarely attributable to AminoChain (**Exhibits I, J**). Although AminoChain is not the only entity that has published academic work implementing NFT-based biospecimen tokenization without proper attribution to Mr. Uribe's foundational work, the Barnes AJOB paper's deliberate relegation of Mr. Uribe's prior art to an unrelated GDPR citation — while claiming the core NFT-biospecimen concept — demonstrates AminoChain's subjective awareness of Mr. Uribe's priority and its strategic decision to obscure that priority in the academic record. The broader industry context confirms the same pattern of uncredited, later adoption: the other entrants to this narrow field, including the de-bi, co. publications referenced in the JMIR study, published their NFT-biospecimen architectures years after Mr. Uribe's 2018 to 2020 public disclosures, and likewise without citing Mr. Uribe's patents or his 2020 JBBA paper. That these entrants followed Mr. Uribe's already-published architecture, rather than independently and contemporaneously arriving at

it, confirms that the technology Mr. Uribe invented has been adopted across the biobanking sector and corroborates the non-obviousness of the asserted claims: no one in the art practiced the claimed architecture before Mr. Uribe, and the few who later did so post-date, and omit any citation to, his work. Mr. Uribe does not allege that AminoChain controls or directs these third-party publications. (**Exhibit J**.)

**67. Industry Deployment Evidence — The Architecture Is Real, Not Abstract.** The technical architecture claimed in the '808 and '203 Patents is being deployed in the biobanking industry on public blockchains. By way of industry example, on April 10, 2025, a research group (Sanchez et al., de-bi, co.) that published years after Mr. Uribe's 2018 priority filings and his 2020 publication, and without citing him, documented in a feasibility study in *JMIR Bioinformatics and Biotechnology* the deployment of an ERC-721 non-fungible token architecture for biospecimen tracking on the Ethereum mainnet, in which 151 "soul-bound" biowallet NFTs were minted at an average cost of approximately $4.51 per token (**Exhibit AE**). Mr. Uribe does not allege that the de-bi, co. researchers (a separate, later-publishing third party cited only for the limited purposes below) were directed or controlled by AminoChain. This paragraph concerns those academics only and is not a characterization of the biobanks, hospitals, donors, and platform participants whose infringing acts AminoChain directs and controls, as alleged in the Causes of Action below. The JMIR publication is cited here solely for two limited and proper purposes: (i) it confirms that the patented architecture is technically operational on real public-blockchain infrastructure, corroborating that the claims recite a concrete, non-conventional technical implementation; and (ii) it provides an industry-published, contemporaneous per-token deployment cost benchmark (approximately $4.51) that is useful as one reasonable input into a later damages analysis. The actual scale of AminoChain's infringement (the number of NFTs AminoChain has minted, the costs incurred, and AminoChain's associated revenues) will be established through discovery from

AminoChain itself. AminoChain has publicly represented in its own marketing that approximately 500,000 biosamples are tracked across twenty-five biobanks on its platform (**Exhibit AB**), supporting a damages basis that is substantial and provable.

**68. Economic Model Built on Infringing Architecture.** AminoChain's biosample economics model — including its planned donor token-incentive system, the Specimen Center marketplace, and the donor compensation structure — is built entirely on the foundation of Biosample NFTs. The economic value proposition presented to investors, biobanks, and donors depends on the patented ability to uniquely represent biospecimens as non-fungible tokens with provenance metadata on a public blockchain. Without the patented NFT architecture, AminoChain has no differentiated product. (**Exhibit AI.**)

**69. Doctrine of Equivalents — Every AminoChain Institutional Node Is an Equivalent of the Claimed Kiosk.** Claim 1 of the '808 Patent recites software and blockchain limitations (the non-fungible token associated with a public blockchain, the set of provenance data included in that token, and the private digital wallet) and structural limitations (the plurality of locker boxes, the touchscreen, the camera, the air-quality, temperature, humidity, and GPS sensors, the printer, and the metal outer kiosk body that houses them, standing on a base platform). Mr. Uribe alleges that the software and blockchain limitations are met *literally*, as shown above and in AminoChain's own AminoChainDonation.sol source code (**Exhibit G**); to the extent the structural limitations of Claim 1 are not met literally, Mr. Uribe alleges infringement under the doctrine of equivalents, in the alternative to literal infringement. Fed. R. Civ. P. 8(d)(2)–(3). Equivalence is assessed limitation-by-limitation, and a limitation is satisfied where the difference between the claimed structure and the accused structure is insubstantial, including where the accused structure performs substantially the same function, in substantially the same way, to achieve substantially the same result. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 39–40 (1997). That the specification recites the enumerated

kiosk elements as "exemplary only" and subject to substitution by "equivalent elements…
without changing the essential function or operation" ('808 Patent, col. 5, ll. 25–33) confirms
that those recitations are not lexicographically limiting; the controlling analysis is the
limitation-by-limitation insubstantiality showing that follows.

AminoChain does not collect biospecimens in the abstract. At each onboarded institution, the
accused system is deployed as a discrete biospecimen-intake-and-storage installation,
comprising the institution's controlled-access specimen freezer or repository, a co-located
intake workstation and specimen-scanning hardware, and on-site computing infrastructure
running AminoChain's mandatory Amino Node software. It is this discrete, tangible,
geographically fixed installation (not the institution at large) that is the accused equivalent of
the claimed kiosk. AminoChain admits the distributed deployment in its own words: "Samples
stay where they are, in hospitals, research centers, and biobanks" across the world. (**Exhibit
Z.**) Each such installation is the structural equivalent of the claimed kiosk, limitation-by-
limitation:

- **"a metal outer kiosk body that houses each of the plurality of locker boxes"** ('808
Patent, Claim 20): the node's metal-bodied specimen freezer or cryogenic cabinet and the
metal enclosure of the on-site server, which physically house, respectively, the stored
biospecimens and the Amino Node hardware. The substitution of one metal enclosure for
another metal enclosure of insubstantially different shape (not of a building for a kiosk) does
not read the housing limitation out of the claim. To the extent Claim 20's single metal body is
construed to require one unitary housing for all components, Mr. Uribe relies on Claim 1,
which recites no metal outer body, for the doctrine-of-equivalents theory, and reserves Claim
20 for any node that integrates such housing.

- **"a plurality of locker boxes that each store a biospecimen test kit":** the biobank's
physical specimen repositories and freezers in which the donor's biospecimen physically
resides at the node.

- **"a touchscreen that guides the user":** the node's intake workstation presenting AminoChain's web-based Donor Platform and Specimen Center interface, which guides the donor through collection and registration.

- **"a camera that scans a unique encoding on the biospecimen test kit":** the node's barcode and QR sample-identifier capture, recorded as the unique "Sample ID" that encodes each specimen.

- **the air-quality, temperature, and humidity sensors whose readings are "included… in a set of provenance data":** the node's cold-chain and environmental-monitoring instrumentation, which, on information and belief, records storage-condition and collection-condition data (including temperature) into the provenance metadata written to the Biosample NFT. To the extent a node captures temperature and storage condition but not air quality or humidity specifically, Mr. Uribe asserts the temperature and storage-condition subset of this limitation and does not contend the air-quality limitation is met as to that node.

- **"a GPS sensor that calculates a present location" included in provenance data:** the node's fixed, recorded institutional location, captured as the specimen's "Location" provenance field across a global network.

- **"an embedded computing device comprising a [CPU], data storage, a memory module, and a plurality of input devices":** the institution's servers running AminoChain's mandatory Amino Node software, which receive and process the same touch, scan, and sensor inputs.

- **"a printer that prints out a confirmation of [the] transaction… and the creation of the NFT":** the node generates a transaction confirmation by writing an immutable, donor-retrievable confirmation of the collection and NFT creation to the blockchain when the Biosample NFT is minted by AminoChainDonation.sol (**Exhibit G**), performing the printer's function (fixing a durable, retrievable transaction confirmation) in substantially the same way

(recording it to a persistent medium) to achieve substantially the same result (a durable record the donor can retrieve). The substitution of a durable digital record for a paper printout is an insubstantial difference.

- **"a non-fungible token (NFT)… which represents the personal biospecimen… and is created to include the set of provenance data":** AminoChain's "Biosample NFT." *This limitation is met literally, not by equivalents* (**Exhibit G**).

Each installation therefore performs *substantially the same function* (anonymous physical biospecimen collection, provenance-metadata capture, and creation of an NFT paired to the donor's private wallet), in *substantially the same way* (institution-sited hardware running AminoChain's mandatory software connected to a public blockchain), to achieve *substantially the same result* (a Biosample NFT bearing provenance metadata, held in the donor's non-custodial wallet) as the claimed kiosk. The only difference is that AminoChain distributes these identical functional components across co-located institutional hardware rather than integrating them into one freestanding cabinet; that difference in physical packaging is insubstantial and does not read the structural limitation out of the claim. *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012) (claim vitiation is not a separate exception to the doctrine of equivalents, but shorthand for the legal determination that no reasonable jury could find the difference insubstantial). The equivalent asserted is not biobank storage or laboratory information management generally; it is the specific integrated combination of anonymous biospecimen intake, capture of the recited provenance data into the metadata of a non-fungible token, and pairing of that token to the donor's non-custodial private-key wallet. A generic biobank freezer or laboratory information management system that does not mint a provenance-bearing NFT paired to a donor wallet is outside the asserted range of equivalents. A person of ordinary skill in the art at the time of AminoChain's infringement would have recognized an integrated cabinet and a co-located institutional intake-and-storage installation as known, interchangeable, and obvious-equivalent means of

housing the recited components. AminoChain directs and controls the configuration and operation of each node through its mandatory Amino Node software and its AminoChainDonation.sol smart contract, conditions each institution's participation in its network and receipt of platform benefits on adoption of that software and AminoChain's standardized architecture, and obtains the benefit of the resulting collection-and-tokenization apparatus, such that the apparatus operated at each node is attributable to AminoChain for purposes of direct infringement. Because AminoChain has onboarded approximately twenty-five biobanks, hospitals, and research centers tracking roughly five hundred thousand biospecimens (**Exhibit AB**), each such institutional node is itself an equivalent of the claimed kiosk, and each independently embodies the apparatus claims of the '808 Patent under the doctrine of equivalents. Three further considerations confirm that this difference is insubstantial and that no limitation is vitiated. First, the '808 specification describes its structural recitations as non-limiting and expressly substitutable: it states that the list of constituent elements "is intended to be exemplary only and it is not intended that this list be used to limit" the kiosk, that "equivalent elements… may be substituted within the present disclosure without changing the essential function or operation of the privacy-preserving biospecimen test kit kiosk," and that "the invention is not limited to the embodiments set forth and… can be adapted for any of several applications." ('808 Patent, col. 5.) The words "standalone" and "stand-alone" appear nowhere in the specification; a layout that distributes the recited components across co-located institutional hardware is therefore within the invention as described, not outside it. Second, under the function-way-result test the physical containment is the root of trust for the resulting token: the claimed kiosk binds a unique physical biospecimen to a tamper-evident record by isolating that specimen in an access-controlled, environmentally monitored compartment at intake, and AminoChain's node performs that same function, in the same way (an access-controlled, environmentally monitored repository with a co-located intake workstation), to achieve the same result (a provenance-bearing Biosample NFT whose integrity depends on that controlled intake). The

Biosample NFT has evidentiary and commercial value only because the physical enclosure assures the specimen was not substituted or tampered with at ingestion, and that assurance is identical whether the enclosure is a freestanding cabinet or a freezer within a biobank room. Third, AminoChain's mandatory Amino Node software draws an operational boundary around the institution's intake workstation, scanning hardware, and refrigeration units and compels them to function collectively as a single ingestion node; the difference between a boundary of welded steel and a boundary of software-enforced control over the same functional components is insubstantial. An automated teller machine does not cease to be a kiosk when a bank installs the same terminal, dispensing mechanism, and security software inside a branch-lobby vault rather than a freestanding sidewalk shell; it remains a system that securely bridges a physical asset to a digital ledger by the same structural mechanics. AminoChain has not avoided the claimed apparatus; it has deployed it as a distributed, institution-sited equivalent of the claimed kiosk.

## VII. INFRINGEMENT OF THE '203 PATENT

**70.** AminoChain's Donor Platform and Specimen Center practice each element of Claim 1 of the '203 Patent: (a) public key infrastructure and asymmetric encryption via non-custodial wallets (ToS, **Exhibit AJ**); (b) Non-Fungible-Tokens from a public blockchain representing biospecimens ("Biosample NFTs"); (c) self-sovereign digital identifiers for each donor stored in private-key wallets; (d) consent management ("who can access them"); (e) tokenization of encrypted datasets using NFTs stored in digital wallets ("Biosample NFTs"); (f) transactions recorded on a public blockchain (Syndicate appchain, confirmed October 2025); and (g) a bloom filter for the members of the family to anonymously search for indications of usage of the biospecimens, the function of which AminoChain practices through its own searchable, privacy-preserving cross-network search. AminoChain states that each biospecimen's "metadata, what they are, who can access them, how they were collected, becomes searchable

and standardized across a decentralized network" (**Exhibit Z**), and AminoChain's published source code includes a companion subgraph that indexes each minted biospecimen token for query (**Exhibit G**). A bloom filter is a privacy-preserving data structure for anonymous set-membership search; AminoChain's searchable, standardized, cross-network biospecimen-metadata search performs *substantially the same function* (anonymous, privacy-preserving search across a distributed network for indications of biospecimen usage), in *substantially the same way* (a queryable index distributed across a decentralized network that does not expose donor identity), to achieve *substantially the same result*, and therefore meets the bloom-filter limitation literally or, in the alternative, under the doctrine of equivalents.

71. The '203 Patent further claims depositing "encrypted resulting data sets into a unique digital repository assigned to the shared digital family wallet" — an NFT-gated biodata vault architecture. AminoChain's ToS confirms "digital assets stored in any non-custodial digital wallet," and its Donor Platform creates "verifiable links from consent → sample → derived data" with "Cryptographic provenance" — the same vault architecture.

72. Regarding the "family" limitation in the '203 Patent: AminoChain, through its Myasthenia Gravis study with its clinical partner ImYoo, actually collects, links, and manages on its platform biospecimens from related family members, namely Myasthenia Gravis patients together with their family-member "comparison participants" (**Exhibit AK**), using the AminoChain-provisioned donor wallets that associate those related specimens. That is the practice, not merely the capability, of a shared, family-linked multi-donor wallet, and it meets the claimed "shared family digital wallet" limitation. To the extent the correspondence is found to be non-literal, AminoChain's family-linked multi-donor wallet practice is the functional equivalent of the claimed shared family digital wallet.

73. Regarding the "Self-Sovereign Digital DNA Fingerprint" claimed in the '203 Patent (created "using at least fifty single-nucleotide polymorphisms"): AminoChain's early architecture (Devpost, November 2022) describes a "privacy-preserving HLA hashing

mechanism" that stores "encrypted HLA data as a struct of hashes corresponding to each of their HLA genes" and enables anonymous donor matching by comparing hashed HLA alleles. HLA (Human Leukocyte Antigen) alleles are genetically defined by SNP-level variation within the MHC region of chromosome 6; modern HLA typing is SNP-driven, and HLA alleles can be accurately imputed from SNP data alone using established genomic tools (e.g., HIBAG, SNP2HLA). AminoChain's HLA hashing mechanism performs *substantially the same function* (creating a unique, cryptographically secure, privacy-preserving biometric identifier for each donor), in *substantially the same way* (hashing genetic markers derived from the donor's DNA sequence), to achieve *substantially the same result* (enabling anonymous biospecimen matching, tracking, and NFT/wallet linkage without identity disclosure) as the claimed 50-SNP Self-Sovereign Digital DNA Fingerprint. HLA alleles in the MHC region are defined by, and computationally derived from, well over fifty single-nucleotide polymorphisms (standard HLA-imputation methods such as HIBAG and SNP2HLA each require fifty or more SNP markers to call an HLA type); AminoChain's hashed HLA-allele struct is therefore, as implemented, a privacy-preserving fingerprint constructed from genotype data comprising at least fifty single-nucleotide polymorphisms, and it literally meets this limitation of Claim 1. Whether the limitation "created using at least fifty single-nucleotide polymorphisms" reads upon a cryptographic hash of HLA loci that are themselves defined by, and called from, fifty or more single-nucleotide polymorphisms is, at most, a question of claim construction that cannot be resolved against Mr. Uribe on a motion to dismiss. *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1349 (Fed. Cir. 2018). Mr. Uribe relies principally on literal infringement of this limitation. (**Exhibit AF.**)


## VIII. CAUSES OF ACTION

**74.** Count I: Direct Infringement of the '808 Patent (35 U.S.C. § 271(a))

Mr. Uribe incorporates and re-alleges each of the foregoing paragraphs as if fully set forth herein.

**75.** AminoChain has directly infringed and continues to directly infringe at least Claim 1 of the '808 Patent by making, using, offering to sell, and selling within the United States the Specimen Center, Donor Platform, at-home biospecimen kits, and related technology, which creates non-fungible tokens representing biospecimens with provenance metadata on a public blockchain, stored in private digital wallets, as set forth in the claim chart in Section VI above. To the extent that any element of the asserted claims is not found to be literally embodied in the accused AminoChain platform, the accused products and processes perform substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed invention, and therefore infringe under the Doctrine of Equivalents.

**76.** Count II: Direct Infringement of the '203 Patent (35 U.S.C. § 271(a))

Mr. Uribe incorporates and re-alleges each of the foregoing paragraphs as if fully set forth herein.

**77.** AminoChain has directly infringed and continues to directly infringe at least Claim 1 of the '203 Patent by making, using, offering to sell, and selling within the United States the Specimen Center, Donor Platform, and related technology, which tokenizes biospecimen datasets using non-fungible tokens on a blockchain, stores those tokens in private-key-controlled digital wallets, manages consent and ownership through the token architecture, and records transactions on a public blockchain, as set forth in Section VII above. To the extent that any element of the asserted claims is not found to be literally embodied in the accused AminoChain platform, the accused products and processes perform substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed invention, and therefore infringe under the Doctrine of Equivalents.

**78.** Count III: Induced Infringement (35 U.S.C. § 271(b))

Mr. Uribe incorporates and re-alleges each of the foregoing paragraphs as if fully set forth herein.

**79. Knowledge of the Patents (*Global-Tech*).** AminoChain had actual, documented knowledge of the '808 and '203 Patents and the BioNFT™ framework. Knowledge of the '808 Patent (issued February 27, 2024) and the '203 Patent (issued May 14, 2024) was conveyed in writing on the dates set forth in Section V, including without limitation: (a) the September 3, 2024 written license offer identifying both patent numbers and alleging infringement (**Exhibit Q, Part 0**); (b) the September 16, 2024 written response by AminoChain's outside intellectual-property counsel, Frank L. Gerratana of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., expressly acknowledging both asserted patent numbers (**Exhibit Q, Part 0b**); (c) the September 30, 2024 follow-up presenting three options including a draft license with ethical-use conditions (**Exhibit Q, Part 1**); (d) the November 8, 2024 written license revocation (**Exhibit Q, Part 2**); and (e) the December 4, 2025 formal notice served on Andreessen Horowitz (AminoChain's lead investor) identifying both patent numbers and the infringing acts (**Exhibit W**). AminoChain's knowledge of the BioNFT™ framework predates patent issuance and is documented in (i) the November-December 2022 communications between Mr. Uribe and AminoChain's co-founder and Chief Scientific Officer Jelani Clarke, including the December 1, 2022 transmission of Mr. Uribe's complete BioNFT™ pitch deck identifying his patent applications as "3 Patents (pending)" (**Exhibit K**); and (ii) the June–August 2023 communications between Mr. Uribe and AminoChain's CEO and co-founder Caspar Barnes, including the June 21, 2023 image of Mr. Uribe's patent application sent to Barnes, the June 29, 2023 video meeting at which Mr. Uribe explained the framework, and the August 15, 2023 message from Barnes stating "I of course would like to mention your Framework of BioNFTs" (**Exhibit N**). This pleading satisfies the knowledge element of induced infringement under *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

**80. Specific Intent to Cause Infringement (*DSU Medical / Bill of Lading*).** AminoChain specifically intended that third parties infringe the '808 and '203 Patents. The specific intent is established by AminoChain's own contemporaneous public statements and marketing materials, each of which expressly directs third parties to perform the infringing acts: (a) AminoChain's pitch deck distributed to investors stated "Turn bio-specimen donations into NFTs" (**Exhibit O**); (b) AminoChain's November 2022 Devpost Chainlink Hackathon submission — the inception of the company — described the explicit purpose of "tokeniz[ing] donated bio-specimens" on a public blockchain (**Exhibit L**); (c) AminoChain's June 20, 2023 CloudLIMS partnership press release described the partnership's purpose as enabling biobanks to "turn donated biomaterials into Non-Fungible Tokens (NFTs)" (**Exhibit M**); (d) AminoChain's CEO Caspar Barnes stated on the Antler podcast on March 31, 2026: "we thought let's turn donated bio samples into NFTs" (**Exhibit AA**); (e) on Antler's "Further, Faster" podcast (March 31, 2026), AminoChain's CEO described a planned donor token-incentive system under which donors earn redeemable points for donating bio samples on AminoChain's platform — a model that depends on third parties (biobanks, donors) minting and holding the underlying Biosample NFTs (**Exhibit AA**, 35:46–37:37); and (f) the Antler founder-story page features the express invitation: "If you turn biosamples into NFTs, then they're trackable" (**Exhibit P**). These statements are not aspirational marketing — they are operational instructions and explicit invitations to third parties to perform the patented acts. Each constitutes "evidence of culpable conduct, directed to encouraging another's infringement," sufficient to satisfy the specific-intent requirement. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012) (induced infringement adequately pled where complaint identifies specific marketing materials encouraging third-party infringement).

**81. Underlying Direct Infringement by Identified Third Parties.** Third parties have directly infringed the '808 and '203 Patents through their use of AminoChain's platform, products, and services. The directly infringing third parties include: (a) the twenty-five (25) biobanks and research institutions that AminoChain publicly identifies as operating "Amino Nodes" on AminoChain's platform (**Exhibit AB**), each of which uses the patented NFT-based biospecimen tokenization architecture as alleged in Section VI above; (b) ImYoo, Inc., AminoChain's clinical research partner, which operates the Myasthenia Gravis at-home biospecimen kit study and uses the AminoChain Donor Platform to manage biospecimens from MG patients and family-member comparison participants (**Exhibit AK**); and (c) the approximately five hundred thousand (500,000) individual donors whose biospecimens AminoChain claims are tracked on its platform, each of whom uses an AminoChain-provisioned non-custodial digital wallet that contains a Biosample NFT representing the donor's specimen (**Exhibit AB**). Each of these third parties practices each element of at least Claim 1 of the '808 Patent and Claim 1 of the '203 Patent in the manner set forth in Sections VI and VII above. As a primary matter, AminoChain is itself a single-entity direct infringer of the asserted method and system claims under 35 U.S.C. § 271(a), because AminoChain itself makes and uses the accused platform and itself performs, through its own "Amino Node" software and its AminoChainDonation.sol smart contract, the steps of tokenizing each biospecimen and recording it on a public blockchain; the underlying-third-party-infringement and attribution allegations in this Paragraph are pleaded in the alternative under Federal Rule of Civil Procedure 8(d), to the extent any step is found to be performed by a biobank or donor rather than by AminoChain itself. In the alternative, the acts of the third-party direct infringers are directed and controlled by AminoChain within the meaning of *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc): AminoChain conditions each participating institution's and donor's participation in, and receipt of the benefits of, its federated Specimen Center platform on performance of the claimed steps, and establishes the manner and timing of that performance, through (i) its mandatory "Amino Node" software

package, which AminoChain requires each participating institution to deploy and which "integrates into the institution's endogenous tech" to mint and manage the Biosample NFTs (**Exhibit AP**); (ii) the non-custodial donor wallets that AminoChain provisions and into which the Biosample NFTs are minted, which AminoChain's own Terms of Service describe as "digital assets stored in any non-custodial digital wallet managed on your behalf by AminoChain" and through which a donor "may connect Research Assets to [the donor's] Account" (**Exhibit AJ**); and (iii) the AminoChainDonation.sol smart contract that performs the token-minting step (**Exhibit G**). A biobank that does not deploy the Amino Node software cannot list its specimens on, or transact them through, the Specimen Center network, and a donor who does not use the AminoChain-provisioned non-custodial wallet cannot receive the Biosample NFT that represents the donor's specimen.

**82. Affirmative Acts of Inducement.** AminoChain has committed numerous affirmative acts that caused, encouraged, and instructed the direct infringement by third parties, including without limitation: (a) developing and distributing the "Amino Node" node-software package to biobanks, designed for the express purpose of tokenizing donated biospecimens as NFTs (**Exhibit M**); (b) operating and providing access to the Donor Platform web application, which instructs individual donors to create non-custodial digital wallets and which mints Biosample NFTs into those wallets (**Exhibit AL**); (c) shipping at-home biospecimen collection kits to clinical study participants, each kit accompanied by instructions to register and tokenize the resulting specimen on AminoChain's platform (**Exhibit AK**); (d) developing, deploying, and publishing the open-source Solidity smart contract AminoChainDonation.sol (and related repositories), which implements the patented NFT-based biospecimen architecture and was made available to third-party developers and partners (**Exhibit G**); (e) maintaining a public-facing Specimen Center marketplace through which third-party researchers acquire access to tokenized biospecimens, an architecture which requires the underlying NFT-based tokenization to function (**Exhibit AH**); (f) entering into partnership agreements with third

parties (including CloudLIMS, ImYoo, and the twenty-five biobanks) that contemplate and require the partners' use of the patented NFT-based architecture (**Exhibits M, AB, AK**); (g) marketing, presenting, and exhibiting the platform to the genomics and biobanking communities at conferences including ISBER, ASHG 2025, and MGFA 2026 for the express purpose of recruiting additional third parties to operate the infringing architecture (**Exhibits Z, AH**); and (h) publicly describing its planned donor token-incentive system, which would structurally depend on third parties' continued use of the patented NFT-based architecture as its operational foundation (**Exhibit AC**). Each of these acts is an "affirmative act of inducement" sufficient to support liability under 35 U.S.C. § 271(b). *See Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1349–50 (Fed. Cir. 2015) (en banc).

**83. Willful Blindness (Alternative).** To the extent the Court determines that any element of AminoChain's actual knowledge is not fully established at the pleading stage, AminoChain's knowledge is alternatively established under the willful-blindness doctrine. AminoChain subjectively believed there was a high probability that Mr. Uribe's patents covered its conduct — as demonstrated by (i) Barnes's August 2023 acknowledgment of the "Framework of BioNFTs" by name (**Exhibit N**), (ii) Barnes's November 2024 academic paper citing Mr. Uribe's prior work but deliberately misdirecting the citation to GDPR rather than the foundational NFT-biospecimen concept (**Exhibit J**), (iii) AminoChain's systematic post-notice scrubbing of NFT and blockchain terminology from its public-facing materials (**Exhibit Z**), and (iv) AminoChain's public acknowledgment of "major headwinds from a legal battle with GenoBank.io over BioNFT intellectual property rights" (**Exhibit T**). AminoChain took deliberate actions to avoid learning the precise scope of those patents while continuing to operate and expand the infringing platform. *See Global-Tech*, 563 U.S. at 769 (willful blindness establishes the knowledge element of induced infringement where defendant subjectively believes there is a high probability of infringement and takes deliberate steps to avoid learning the truth).

**84. No Substantial Non-Infringing Use.** AminoChain's Donor Platform, Specimen Center, Amino Node software, and related products and services have no substantial non-infringing use. Each of these products is purpose-built to perform the patented function: tokenizing biospecimens as non-fungible tokens on a public blockchain, storing those tokens in private-key-controlled digital wallets, embedding provenance metadata into the tokens, and recording transactions on a public blockchain. AminoChain's public marketing confirms that this is the platform's exclusive function (e.g., "decentralized biobank and Layer 2 network"; "turn donated biomaterials into NFTs"; and a planned donor token-incentive layered on its Biosample-NFT platform). Where a defendant designs and distributes a product whose only commercial use is to perform the patented acts, specific intent to induce infringement is properly inferred. *See Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1380 (Fed. Cir. 2017) (specific intent adequately pled where accused product was designed for use in the patented configuration).

**85. Good-Faith Belief in Invalidity Is Not a Defense.** To the extent AminoChain may assert that it believed in good faith that the '808 or '203 Patents are invalid, such a belief is not a defense to induced infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 642 (2015) ("belief regarding validity cannot negate the scienter required under § 271(b)").

**86.** Count IV: Willful Infringement (35 U.S.C. § 284)

Mr. Uribe incorporates and re-alleges each of the foregoing paragraphs as if fully set forth herein.

**87. Legal Standard (*Halo*).** Section 284 of the Patent Act authorizes enhanced damages of up to three times actual damages for willful infringement. The Supreme Court has held that enhanced damages are appropriate to punish "the type of culpable behavior" that includes conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or — indeed — characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016). The required showing is the defendant's subjective state of mind —

specifically, whether the defendant acted "with knowledge that its actions constituted infringement or with reckless disregard of an unjustifiably high risk of infringement." *Id.* at 105–06; *see also Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020).

**88. Subjective Knowledge and Reckless Disregard.** AminoChain knew or recklessly disregarded the '808 and '203 Patents (and the parent patent applications) at every stage of its conduct. The factual record set forth in Section V establishes subjective knowledge by clear and specific facts, including without limitation: (a) **November 17, 2022:** AminoChain's CSO Jelani Clarke initiated direct contact with Mr. Uribe specifically to learn the BioNFT™ framework (**Exhibit K**); (b) **December 1, 2022:** Clarke received Mr. Uribe's complete BioNFT™ pitch deck containing the slide "3 Patents (pending)" (**Exhibit K**); (c) **June 21– August 15, 2023:** AminoChain's CEO Caspar Barnes received an image of Mr. Uribe's patent application, attended a video meeting at which Mr. Uribe explained the framework, and explicitly acknowledged the "Framework of BioNFTs" by name in writing (**Exhibit N**); (d) **February 23–March 5, 2024:** Immediately following the issuance of the '808 Patent on February 27, 2024, AminoChain's CEO Caspar Barnes organized a Google Meet conference with Mr. Uribe, AminoChain's CSO Jelani Clarke, and third-party Robert Hewitt (Biosample Hub UK) on February 28, 2024, and subsequently pitched the patented architecture in writing to Hewitt while copying Mr. Uribe, stating "the whole AminoChain platform 'decentralises' the bio-sample procurement process" (Verified Email Archive, May 19, 2026); (e) **September 3, 2024:** AminoChain received a written license offer dated September 3, 2024 (transmitted by email on September 4, 2024 at 12:00 a.m. PDT) identifying both issued patents by number, alleging infringement based on AminoChain's public "Biosample NFTs" statements, and requesting response within fourteen (14) days (**Exhibit Q, Part 0**); (f) **September 16, 2024:** AminoChain's outside intellectual-property counsel at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. (Frank L. Gerratana, Member) responded in writing, expressly acknowledging

both asserted patent numbers and confirming that the firm had been "engaged to represent AminoChain, Inc. in connection with your letter dated September 3, 2024" — but declined to accept the license, declined to cease the accused activity, and instead demanded a limitation-by-limitation claim chart (**Exhibit Q, Part 0b**); (g) **September 27, 2024:** AminoChain's counsel Peter A. Biagetti (Mintz Levin) sent Mr. Uribe a counterstrike Cease & Desist Letter directed AT him, attempting to flip the legal pressure (**Exhibit R**); (h) **September 29, 2024:** Biagetti sent a second message instructing Mr. Uribe to "refrain from asking anyone to 'witness'" the license process — direct evidence of an intimidation campaign (**Exhibit R**); (i) **September 30, 2024:** Mr. Uribe sent a substantive three-option follow-up email with an attached draft non-exclusive license containing ethical-use conditions (**Exhibit Q, Part 1**); (j) **November 8, 2024:** Mr. Uribe served a formal license revocation in writing (**Exhibit Q, Part 2**); (k) **January 29, 2025:** Mr. Uribe sent an "Urgent" written escalation to a16z crypto's legal team identifying both patents and the unanswered license offer — no response (**Exhibit U**); (l) **April 24, 2025:** Mr. Uribe sent a follow-up "Time Sensitive" escalation to a16z crypto's legal team — no response (**Exhibit U**); (m) **April 28, 2025:** Harvard Undergraduate Blockchain Conference excluded Barnes from its DeSci Enterprise BioMed panel after reviewing Mr. Uribe's submitted evidence (**Exhibit X**); (n) **May 8, 2025:** Mr. Uribe escalated to ISBER leadership confirming Taylor & Francis's formal research-integrity investigation of the Barnes AJOB paper and identifying two independent academic critiques (**Exhibit Y**); (o) **December 4, 2025:** Mr. Uribe served a 17-page formal notice on Andreessen Horowitz (AminoChain's lead investor and board influencer) detailing the infringement and the chain of pre-suit notice, with a January 3, 2026 response deadline (**Exhibit W**); and (p) **December 31, 2025:** Mr. Uribe sent a final pre-suit personal appeal to Arianna Simpson (the a16z partner who led the seed round) and six additional a16z addresses; receipt was confirmed by an automated reply from a16z Associate General Counsel Zach Gray on the same day; a16z provided no substantive response before the January 3, 2026 deadline expired (**Exhibit U**). AminoChain's engagement of top-tier patent counsel within twelve (12) days of receiving Mr. Uribe's letter

(followed by procedural deflection, an intimidating counterstrike C&D, and absolute refusal to substantively engage on the merits despite Mr. Uribe's repeated good-faith escalations over fourteen months to both AminoChain and its lead investor) demonstrates AminoChain's subjective awareness of the seriousness of the patent allegations and its deliberate choice to proceed without authorization. Failure to seek or obtain an opinion of counsel, while not dispositive, is a permissible factor in the willfulness analysis. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021).

**89. Egregious Post-Notice Conduct.** AminoChain's conduct after receiving notice satisfies the *Halo* egregiousness standard. After receiving Mr. Uribe's September 3, 2024 license offer and after engaging Mintz Levin to issue a deflective response on September 16, 2024 rather than substantively engaging on the merits or accepting the license, AminoChain did not cease, modify, or design around the infringing platform — it expanded operations and doubled down: (a) **September 25, 2024:** Eight days after the 14-day deadline for substantive response expired without AminoChain accepting the license or ceasing the accused activity, AminoChain announced a $5 million seed round led by Andreessen Horowitz built on commercializing the infringing architecture (**Exhibits O, AH**); (b) **November 5, 2024:** Barnes published a peer-reviewed paper in the *American Journal of Bioethics* describing the patented architecture as his own, while deliberately misdirecting the only citation to Mr. Uribe's prior work to an unrelated point (GDPR right-to-erasure) (**Exhibits I, J**); (c) **2025 throughout:** AminoChain expanded the infringing platform to twenty-five biobanks and approximately five hundred thousand tracked biospecimens (**Exhibit AB**); (d) **February 15, 2025:** Third-party media (*Science Times*) publicly confirmed AminoChain faced "major headwinds from a legal battle with GenoBank.io over BioNFT intellectual property rights" — AminoChain's investors, partners, and the broader market were on notice (**Exhibit T**); (e) **October 8, 2025:** AminoChain "launched their own chain" (Syndicate appchain) and exhibited at ASHG 2025, actively recruiting additional infringers (**Exhibits Z, AH**); (f) **March 31, 2026:** Barnes

publicly stated on the Antler podcast: "there are no rules. Like there's literally no rules" — an admission of deliberate disregard for legal constraints (**Exhibit AA**); and (g) **March 31, 2026:** on Antler's "Further, Faster" podcast, AminoChain's CEO described a planned donor token-incentive system ("amino coins"), layering a new speculative financial incentive onto the same patented architecture, in tension with the ethical-use conditions of the revoked license (**Exhibit AA**, 35:46–37:37). This pattern of post-notice expansion, in the face of public dispute coverage and direct investor notice, satisfies the multi-factor analysis of *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992), including (i) deliberate copying, (ii) lack of good-faith belief in non-infringement, (iii) conduct after notice, (iv) defendant's size and financial condition, (v) closeness of the case (which Mr. Uribe submits is not close given the documented copying), (vi) duration of misconduct, (vii) lack of remedial action, (viii) motivation for harm (commercial advantage), and (ix) attempts to conceal misconduct.

**90. Concealment and Consciousness of Guilt.** AminoChain took deliberate steps to conceal the infringing nature of its platform from the public and the academic community, evidencing consciousness of guilt: (a) AminoChain systematically scrubbed the terms "NFT," "non-fungible token," "tokenization," and "blockchain" from its public-facing marketing materials after receiving notice, replacing them with euphemisms such as "digital assets," "research assets," "durable IDs," and "cryptographically anchors" while the underlying technology remained unchanged (**Exhibits Z, AL**); (b) Barnes's November 2024 AJOB paper deliberately misdirected the citation to Mr. Uribe's foundational JBBA publication from the core NFT-biospecimen concept to an unrelated GDPR point, while claiming the NFT-biospecimen concept as Barnes's own (**Exhibits I, J**); and (c) AminoChain failed to disclose the IP dispute to industry publications during fundraising and partnership announcements (**Exhibit S** and other Z-series exhibits). Concealment is a recognized factor in the willfulness analysis. *Read*, 970 F.2d at 827.

**91. Continued Willfulness as of the Date of Filing.** AminoChain's willful infringement is continuing as of the filing of this Complaint. The Donor Platform is currently active (**Exhibit AL**); AminoChain's CEO publicly described its planned donor token-incentive system on the Antler podcast shortly before filing (**Exhibit AA**); business-development activity continued through the April 2026 MGFA Conference (**Exhibit AH**); and Barnes's public statements ratify the conduct (**Exhibit AA**). Mr. Uribe is entitled to enhanced damages up to three times actual damages under 35 U.S.C. § 284, to attorneys' fees in this exceptional case under 35 U.S.C. § 285, and to a finding that this case is exceptional. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (an exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position... or the unreasonable manner in which the case was litigated"). AminoChain's commercial scale and going-concern status, including its $5 million a16z-led seed round and its DeSci market position, are documented in **Exhibit AS** and are offered as evidence of the scope and continuation of the infringing enterprise, not as the measure of the royalty base. AminoChain's active commercial operation as of 2026 is further documented at **Exhibit AM**.

## IX. ENTITLEMENT TO INJUNCTIVE RELIEF

**92. Irreparable Harm:** Mr. Uribe commercializes the patented architecture through his company, GenoBank.io, and competes for the same biobank, hospital, and research-institution customers that AminoChain is capturing. He is therefore not a mere licensor but a direct competitor being displaced from the market for his own invention. Two distinct harms flow from AminoChain's ongoing infringement, and neither can be repaired by money. First, the market for patented, privacy-preserving Web3 biobanking infrastructure is finite and is driven by network effects and high switching costs. Each biobank, hospital, or research institution that AminoChain onboards onto its infringing platform, including its publicly announced ImYoo partnership serving Myasthenia Gravis patients, becomes locked in through data

migration, integration, and consent-ledger continuity, and will not later migrate to Mr. Uribe's licensed platform. Every such adoption is a permanent, unrecoverable loss of foundational market position, first-mover advantage, and network effects that the Patents-in-Suit were intended to secure for the inventor. This is a zero-sum displacement of the patentee from the market for his own invention, not a forgone royalty, and it cannot be quantified or restored by a damages award. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011); *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336 (Fed. Cir. 2013) (loss of market share and erosion of the right to exclude are irreparable harms that damages cannot remedy). Second, Mr. Uribe designed the Biosample NFT specifically to record and enforce patient rights under GDPR, HIPAA, and CCPA, including revocable consent, the right to erasure, and verifiable provenance. AminoChain's publicly described plan to attach a speculative token to that architecture threatens to invert its purpose. The overwhelming majority of speculative ERC-20 tokens are abandoned, collapse in value, or end in rug-pulls that defraud the investors who hold them. If AminoChain issues such a token on the patented architecture and it fails or defrauds participants, the resulting scandal will permanently associate Biosample NFTs and patient-owned genomic data with crypto speculation and fraud in the eyes of patients, biobanks, regulators, and the public, destroying the value of the patented technology at its root and foreclosing its legitimate, compliance-oriented adoption. Reputational destruction of a nascent, ethically-framed technology in this manner is a paradigmatic irreparable injury that money cannot repair. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**93. Inadequate Remedy at Law:** AminoChain was offered a zero-dollar, royalty-free license with only ethical-use conditions and chose instead to commercialize the technology without authorization. Any hardship from an injunction is self-inflicted. The inadequacy of money damages is compounded by AminoChain's publicly described plan to reward donors through a speculative proprietary token, in which, in its own words, "donors share in the financial

upside" (Exhibit AC). If that plan is implemented, the consideration flowing through the infringing platform would be measured in speculative token value rather than ascertainable fiat revenue, leaving no established market rate from which a reasonable royalty could be reliably derived and reinforcing that prospective injunctive relief, not a backward-looking royalty, is the adequate remedy. Mr. Uribe faces permanent loss of his patent rights and the ethical integrity of seven years of research.

**94. Balance of Hardships:** The balance tips sharply in Mr. Uribe's favor. AminoChain failed to respond to a free license and raised approximately $7.8 million on the patented technology. The hardship of an injunction, which would require AminoChain to obtain a license or cease using the patented architecture, is a consequence of its own deliberate choices. The injunction Mr. Uribe seeks is in addition to, and not in lieu of, the full measure of monetary and other relief for AminoChain's past and continuing infringement. As set out in the Prayer for Relief, Mr. Uribe seeks damages adequate to compensate for the infringement and in no event less than a reasonable royalty under 35 U.S.C. § 284, together with any greater lost-profits or other recoverable damages proven at trial; enhanced damages of up to three times the amount found or assessed, based on AminoChain's willful and deliberate infringement, under 35 U.S.C. § 284; a declaration that this is an exceptional case and an award of Mr. Uribe's reasonable attorneys' fees under 35 U.S.C. § 285; costs under 28 U.S.C. § 1920; and prejudgment and postjudgment interest. The pursuit of complete monetary relief for past harm is independent of, and does not diminish, Mr. Uribe's separate entitlement to prospective injunctive relief against continuing and future infringement.

**95. Public Interest:** Patients who donate biological specimens to advance medical research, including the Myasthenia Gravis patients recruited through AminoChain's at-home collection study with its clinical research partner ImYoo, Inc. (**Exhibit AK**), have a right to expect that their samples will not be tokenized into speculative financial instruments. AminoChain's publicly described plan for a speculative donor token-incentive system (**Exhibit AC**) directly

contradicts the ethical-use conditions of the license Mr. Uribe offered and then revoked, which expressly prohibited linking Biosample NFTs to "speculative ERC20 tokens, volatile rewards, or any tokenomics that could incentivize unethical activities" (**Exhibit Q**). Barnes's own statement on the Antler podcast that "there are no rules... there's literally no rules" (**Exhibit AA**) confirms a reckless disregard for the legal and ethical boundaries, including patent rights and informed-consent safeguards, that exist to protect those patients. The public interest is served, not disserved, by an injunction. Enforcing the Patents-in-Suit vindicates the donor-protection and patient-sovereignty purpose for which the patented architecture was created, upholds the integrity of informed consent in biobanking, and preserves the patent system's incentive to invest in ethical medical innovation. Each of the four eBay factors, namely irreparable harm, the inadequacy of money damages standing alone to remedy the prospective harm, the balance of hardships, and the public interest, favors the relief Mr. Uribe requests, and the Court should accordingly grant both the monetary relief and the permanent injunction sought in the Prayer for Relief.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

a. A judgment that AminoChain has infringed and continues to infringe the '808 Patent;

b. A judgment that AminoChain has infringed and continues to infringe the '203 Patent;

c. A judgment that AminoChain's infringement is willful, entitling Mr. Uribe to enhanced damages under 35 U.S.C. § 284;

d. A permanent injunction prohibiting AminoChain, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from further infringement, including but not limited to:

- (i) issuing, minting, creating, or using any "Biosample NFTs," non-fungible tokens, or any digital assets representing biological specimens;

- (ii) creating, marketing, or using any NFT-linked biospecimen kits, at-home collection kits, or donor platforms that tokenize biospecimens;

- (iii) operating any token economy (including the planned "AminoCoins" donor incentive) or other speculative tokenization built on the patented Biosample-NFT architecture;

- (iv) operating the Specimen Center, Donor Platform, Amino Node software, or any substantially similar system that displays, manages, or provides access to biospecimens represented as digital assets on a blockchain;

- (v) depositing encrypted biospecimen-derived datasets into any digital repository gated by a non-fungible token, digital wallet, or encryption key (i.e., any NFT-gated biodata storage or "Biodata Vault" architecture), as claimed in the '203 Patent (Claim 1); and

- (vi) any other system or process, not enumerated in (i) through (v), that practices the claimed ordered combination of the patents-in-suit, namely a non-fungible token that represents an individual physical biospecimen and carries that specimen's provenance metadata, paired to a donor private-key-controlled digital wallet on a public blockchain as claimed in the '808 Patent, or the family-vault architecture using public-key infrastructure, a bloom filter, and non-fungible tokens as claimed in the '203 Patent, in each case without a license from Mr. Uribe;

e. An award of damages adequate to compensate Mr. Uribe, including lost profits and/or a reasonable royalty;

f. An award of attorneys' fees pursuant to 35 U.S.C. § 285 as an exceptional case;

g. An award of costs pursuant to 28 U.S.C. § 1920;

h. Pre-judgment and post-judgment interest; and

i. Such other relief as this Court deems just and proper.

**96.** Authentication of the Documentary Record

Every public-facing source relied upon in this Complaint — AminoChain's website and marketing pages, its GitHub repository, the DeSci Berlin recording, the published AJOB and JMIR articles, the Devpost and third-party coverage, and the dated terminology snapshots — is independently identified, located, and verified in the Public Source Verification Index attached as **Exhibit AN**. For each cited source, **Exhibit AN** records the source description, the originating public URL, and a key quotation, so that the Court and Defendant may retrieve and confirm each source from its original public location. The SHA-256 hash manifest of the archived copies and the dual-chain Merkle anchor are set out separately in **Exhibit AO** under Federal Rule of Evidence 902(14). **Exhibit AN** thereby authenticates the documentary record under Federal Rule of Evidence 901(b)(1) and (b)(4), and the publicly accessible items it indexes are further admissible as self-authenticating under Federal Rule of Evidence 902(5) and 902(6). In addition, AminoChain Chief Executive Officer Caspar Barnes's own recorded description of the accused NFT-biospecimen marketplace architecture, given in a publicly available February 1, 2025 podcast interview, is reproduced with source provenance and timestamped excerpts at **Exhibit AD** (Health Unchained Podcast, Episode 122), which records on its face the source URL, the running time, and the SHA-256 hash values of both the audio recording and the transcript; Mr. Barnes's statements there are admissible as statements of an opposing party under Federal Rule of Evidence 801(d)(2).

**97.** To foreclose any contention that the evidence files were altered after the fact, the integrity of the complete evidentiary record is secured by dual-chain blockchain anchoring, the proof of which is attached as **Exhibit AO**. As detailed in **Exhibit AO**, a SHA-256 manifest hash and a Merkle root were computed over the individual file hashes of the entire evidentiary record, comprising the exhibit set (Exhibits A through AS, including AminoChain's June 17, 2025 Twitter/X post reproduced at Exhibit Z, Tab 5), the verified email archive, and the contemporaneous capture artifacts for that post, and were anchored on June 1, 2026, on two

independent public blockchains: the Sequentias chain (chainId 15132025) and the Avalanche C-Chain (chainId 43114). Each anchor transaction was signed by wallet 0x0947ca077C8a3Ce19e84cd4E518f0986Dc9F4089 and carries an identical payload of the archive tag, the 32-byte Merkle root, and the 32-byte manifest hash. Because each on-chain timestamp predates the filing of this Complaint, any post-filing alteration of an underlying file would change that file's SHA-256, break the Merkle root, and is mathematically precluded. The file-by-file SHA-256 manifest over which the root is computed is identified in **Exhibit AO**, so that the Court and Defendant may independently recompute and confirm the commitment. **Exhibit AO** constitutes a self-authenticating record of a process or system that produces an accurate result under Federal Rule of Evidence 902(14), establishing immutable, independently verifiable provenance for the entire evidentiary set.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## EXHIBITS

ExhibitDescription **A**U.S. Patent No. 11,915,808 B1 (the "'808 patent"): biospecimen kiosk/ locker apparatus with sensors and associated non-fungible token; Daniel Francisco Uribe, sole inventor. **B**U.S. Patent No. 11,984,203 B1 (the "'203 patent"): anonymous family biospecimen tracking using non-fungible tokens, a bloom filter, and a ≥50-SNP genetic fingerprint; Daniel Francisco Uribe and Buchanan, inventors. **C**"The Inventor's Journey" / William Entriken: prior art and inventorship provenance establishing the ERC-721 author's consultation and the origin of the BioNFT technical work. **D**Joint Inventor Agreement (Buchanan/Uribe), signed, establishing Plaintiff's standing to sue on the '203 patent. **E**JBBA paper (May 2020) establishing the priority date for the patented BioNFT subject matter. **F**Claim charts (Tab 1: element-by-element '808 and '203 charts; Tab 2: DeSci Berlin claim-element map).

**G**AminoChain's own GitHub source code, the AminoChainDonation.sol ERC-721 contract, mapping element-by-element to '808 Claim 1. **H**Caspar Barnes, DeSci Berlin talk (June 17, 2024): video and transcript of admissions that the node software "mints an NFT out of that sample," a biobank ends with "50,000 NFTs that represent those samples," each NFT goes onto a "decentralized biosample Marketplace," donors "track where they go" and "earn royalties whenever their samples are transacted upon" under "personalized consent." **I**Caspar Barnes, AJOB paper "Enabling Demonstrated Consent for Biobanking with Blockchain and Generative AI (AJOB, Nov. 5, 2024)" (Nov. 5, 2024, post cease-and-desist), stating that "each donated sample… associated with a unique non-fungible token (NFT) on a blockchain." **J**Barnes AJOB citation analysis (Tab 1: citation analysis; Tab 2: full analysis, PMC12005476). **K**Clarke communications (Nov. 2022): knowledge and willfulness. **L**Devpost hackathon (Nov. 2022): origin and public use of the accused technology. **M**CloudLIMS (June 2023): NFT partnership and public use. **N**Communications between AminoChain CEO Caspar Barnes and Plaintiff (Telegram and LinkedIn, June 21 to August 15, 2023), including Barnes's receipt and praise of Plaintiff's September 24, 2019 GenoBank.io Figure 1 (one non-party name redacted): knowledge, originality, and willfulness. **O**Roseman pitch deck (Oct. 2023): commercial use of the accused technology. **P**Antler founder story: origin and admissions regarding biosamples as NFTs. **Q**License correspondence (four parts): Sept. 3, 2024 license offer, Mintz Sept. 16 response, Sept. 30 follow-up, and Nov. 8 revocation, bearing on good faith and willfulness. **R**Mintz counterstrike (Sept. 2024). **S**The Defiant (Sept. 2024): press coverage of the IP dispute. **T**Science Times (Feb. 2025): press coverage of the IP battle. **U**a16z escalation chain: inducement and a16z nexus correspondence. **V**a16z CSX (three parts): a16z CSX cohort, curriculum, and token rights. **W**a16z formal notice (Dec. 2025): formal notice to a16z crypto. **X**Harvard exclusion (Apr. 2025). **Y**Taylor & Francis / AJOB / ISBER. **Z**Website/terminology evolution 2023–2026 and post-revocation public statement (Tab 1: website scrub before/after; Tab 2: website language changes; Tab 3: protocol-blog scrub Sept. 2025; Tab 4: homepage scrub May 2026; Tab 5: AminoChain June 17, 2025 Twitter/X post, post-revocation continued

operation). **AA**Caspar Barnes, Antler podcast (Mar. 2026): admissions. **AB**Substack "249 Nos" (Mar. 2026): admissions. **AC**AminoCoins (Apr. 2026): commercial use of the accused technology. **AD**Origin/admissions set (four parts). **AE**JMIR "140 NFTs minted" (Apr. 2025): deployment and commercial use. **AF**Third-party coverage (three parts): Devpost, Gate.io, and JMIR. **AG**Gate.com NFT explainer. **AH**AminoChain website and marketing (two parts). **AI**Biosample economics (damages). **AJ**AminoChain Terms of Service. **AK**At-home kit / donor platform (two parts). **AL**Donor platform active (May 2026): ongoing infringement. **AM**Active operation 2026 (Tracxn). **AN**Public source verification index. **AO**Blockchain anchor proof (Fed. R. Evid. 902(14)). **AP**Consolidated infringement-read summary of AminoChain's Specimen Center, Donor Platform, and source code (Fed. R. Evid. 1006), including the AminoChainDonation subgraph minting code. **AQ**AminoChain's 2025 post-correspondence promotion of the Specimen Center network and biobank partners. **AR**Jelani Clarke's November 2022 solicitation of Plaintiff's BioNFT and biobanking work and his AminoChain officer role. **AS**AminoChain's $5M a16z-led seed round and DeSci market position (commercial scale; not the royalty base).

Dated: June 4, 2026
Respectfully submitted,
**DANIEL FRANCISCO URIBE**
*Plaintiff, Pro Se* 659 Colorado Avenue Palo Alto, CA 94306 Email: uribedaniel7@gmail.com
Telephone: (408) 464-2153

## VERIFICATION

I, Daniel Francisco Uribe, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing allegations are true and correct to the best of my knowledge, information, and belief. Executed on June 4, 2026, in Palo Alto, California.

Daniel Francisco Uribe Plaintiff, Pro Se

## NOTE ON SERVICE

This Complaint is a case-initiating pleading. Mr. Uribe will effect service of process on Defendant AminoChain, Inc. in accordance with Federal Rule of Civil Procedure 4. Mr. Uribe intends to request waiver of service under Rule 4(d) by sending the Notice and Request (Form AO-398) and two copies of the Waiver (Form AO-399) to Defendant through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. Proof of service, or the executed waiver under Rule 4(d)(4), will be filed with the Court when complete. A Rule 4(d) waiver request is not itself service of process.

Daniel Francisco Uribe Plaintiff, Pro Se

**END OF COMPLAINT** *Uribe v. AminoChain, Inc.* District of Delaware